## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

_____

|  |  |  |
|---|---|---|
| ALTON NOLEN, | : | |
| | : | |
| Petitioner, | : | |
| | : | Case No. CIV-22-272-F |
| v. | : | |
| | : | Judge Stephen P. Friot |
| JIM FARRIS, Warden, | : | (Capital Case) |
| Oklahoma State Penitentiary, | : | |
| | : | |
| Respondent. | : | |

_____

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254

Hunter S. Labovitz
Katherine Ensler
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania

601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: (215) 928-0520
hunter_labovitz@fd.org
katherine_ensler@fd.org
*Counsel for Petitioner Alton Nolen*

January 27, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... i

RECORD REFERENCES ................................................................................ iv

TABLE OF ATTACHMENTS .......................................................................... v

PROCEDURAL HISTORY PURSUANT TO GENERAL INSTRUCTIONS FOR HABEAS CORPUS ACTIONS UNDER 28 U.S.C. §§ 2241 AND 2254 .......................... vii

STATEMENT OF THE CASE ......................................................................... 1

STATEMENT OF FACTS ............................................................................... 4

CLAIMS FOR RELIEF ................................................................................... 5

I. PETITIONER IS INTELLECTUALLY DISABLED AND INELIGIBLE FOR THE DEATH PENALTY UNDER *ATKINS V. VIRGINIA* AND ITS PROGENY. ........... 5

   A. Introduction and Legal Standard ...................................................... 5

   B. Petitioner Is Entitled to *Atkins* Relief Based on the Evidence Presented During His State Court Proceedings. ......................................................... 7

      1. Significantly Subaverage Intellectual Functioning ........................... 7

      2. Significant Deficits in Adaptive Functioning .................................... 9

      3. Age of Onset ................................................................................. 22

   C. State Court Opinions ........................................................................ 23

      1. The State Court's Denial of Relief Was Contrary to or an Unreasonable Application of *Hall*, *Brumfield*, *Moore I* and *Moore II*, and Based on Unreasonable Findings of Fact. ........................................................ 25

      2. The *Nolen I* Court's Analysis Rendered the *Nolen II* Court's Opinion Unreasonable Under § 2254(d). ...................................................... 41

      3. The *Nolen II* Court Based Its Ruling on an Unreasonable Finding of Fact When It Failed to Remand Nolen's Case for an Evidentiary Hearing. ........... 42

      4. *Nolen I* and *II* Violated *Moore I* By Employing Obsolete Criteria to Define Significant Deficits in Adaptive Behavior. ....................................... 46

   D. Mr. Nolen Is Entitled to *Atkins* Relief Based on the Record Presented in State Court. .................................................................................................. 47

   E. New Evidence and Current Diagnostic Standards Confirm Petitioner's Diagnosis of Intellectual Disability. ...................................................... 47

      1. New Evidence of Mr. Nolen's Deficits in Adaptive Functioning ......... 48

      2. New Diagnostic Standards .............................................................. 53

      3. Petitioner Is ID Under Current Diagnostic Standards. ...................... 54

   F.    Petitioner's New Evidence Should Be Considered By this Court. .........................55

II.      MR. NOLEN WAS INCOMPETENT TO STAND TRIAL. .....................57

  A.  Legal Standard .............................................................................58

  B. Petitioner Was Unable to Consult with Counsel with a Reasonable Degree of Rational Understanding and Did Not Have a Rational Understanding of the Proceedings Against Him. ...........................................................58

    1.    Pre-Trial Proceedings ................................................59

    2.    The Jury Trial .........................................................71

    3.    Post-Conviction Evidence of Incompetency ..........................71

  C.  State Court Opinions .........................................................74

    1.    Direct Appeal Opinion...............................................74

    2.    Post-Conviction Opinion ............................................77

III.    THE GUILT PHASE ADMISSION OF GRUESOME, SHOCKING, IRRELEVANT, AND CUMULATIVE PHOTOS MADE MR. NOLEN'S TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL .................................79

  A.  Legal Standard .............................................................................79

  B.  The Admission of Four Gruesome Photos Was Fundamentally Unfair.................79

  C.  OCCA's Opinion Was Factually and Legally Unreasonable. ...............................84

IV.    THE ADMISSION OF AN IN-LIFE PHOTOGRAPH OF COLLEEN HUFFORD INJECTED PASSION, PREJUDICE, AND OTHER ARBITRARY AND IRRELEVANT FACTORS INTO MR. NOLEN'S TRIAL; AMENDED SECTION 2403 OF THE OKLAHOMA EVIDENCE CODE IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED TO MR. NOLEN'S TRIAL. ...................................86

V.     MR. NOLEN'S DEATH SENTENCE VIOLATES THE SIXTH AND FOURTEENTH AMENDMENTS BECAUSE THE TRIAL COURT ERRONEOUSLY DENIED HIS LEGALLY JUSTIFIED CAUSE CHALLENGES TO TWO JURORS WHO COULD NOT MEANINGFULLY CONSIDER ALL SENTENCING OPTIONS. .................................................91

  A.  Legal Standard .............................................................................91

  B.  The Trial Court's Denial of Defense Cause Challenges to Two Potential Jurors Violated Mr. Nolen's Constitutional Rights.............................................92

  C.  OCCA's Opinion was Factually and Legally Unreasonable.................................94

VI.    APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO PRESENT A CLAIM THAT MR. NOLEN WAS DENIED HIS RIGHT TO A FAIR TRIAL BEFORE AN IMPARTIAL JURY. .................................96

VII.   PROSECUTORIAL MISCONDUCT DENIED MR. NOLEN HIS DUE PROCESS
       RIGHTS TO A FAIR TRIAL AND RELIABLE SENTENCING IN VIOLATION
       OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ................ 100

   A.   Prosecutors Improperly Elicited Sympathy for the Victim, Denigrated the Defense,
        and Inflamed the Passions of the Jury. ...................................................................... 101

   B.   OCCA's Adjudication Was Legally and Factually Unreasonable. ....................... 102

VIII.  APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO RAISE
       PROSECUTORIAL MISCONDUCT AND TRIAL COUNSEL'S
       INEFFECTIVENESS IN FAILING TO OBJECT TO THE MISCONDUCT,
       VIOLATING MR. NOLEN'S SIXTH, EIGHTH, AND FOURTEENTH
       AMENDMENT RIGHTS. ........................................................................................ 104

IX.    MR. NOLEN IS ENTITLED TO RELIEF FROM HIS SENTENCE BECAUSE OF
       THE CUMULATIVE PREJUDICE OF THE CONSTITUTIONAL ERRORS
       DESCRIBED HEREIN. ........................................................................................... 114

PRAYER FOR RELIEF ........................................................................................................ 115

# TABLE OF AUTHORITIES

**Federal Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002) ................................................................ 2, 5, 56

*Bell v. Cone*, 535 U.S. 685 (2002) ................................................................................ 76

*Black v. Workman*, 682 F.3d 880 (10th Cir. 2012) .................................................... 55

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) .................................................. 84, 86, 100

*Brumfield v. Cain*, 576 U.S. 305 (2015) ............................................................. *passim*

*Bruton v. United States*, 391 U.S. 123 (1968) ............................................................ 88

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) .......................................... 101, 103, 105

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) ...................... 104, 105, 113-114, 114

*Cooper v. Oklahoma*, 517 U.S. 348 (1996) ...................................................... 58, 76, 77

*Darden v. Wainwright*, 477 U.S. 168 (1986) ........................................... 79, 88, 100-101

*Darks v. Mullin*, 327 F.3d 1001 (2003) ..................................................................... 115

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) .................................................. *passim*

*Drope v. Missouri*, 420 U.S. 162 (1975) ...................................................................... 58

*Dusky v. United States*, 362 U.S. 402 (1960) .............................................................. 58

*Evitts v. Lucey*, 469 U.S. 387 (1985)......................................................................... 113

*Fry v. Pliler*, 551 U.S. 112 (2007) ........................................................................... 100

*Gardner v. Florida*, 430 U.S. 349 (1977) ........................................................... 103, 108

*Gov't of the Virgin Islands v. Mills*, 821 F.3d 448 (3d Cir. 2016) .............................. 110

*Grant v. Royal*, 886 F.3d 874 (10th Cir. 2018) ..................................................... 58, 76

*Gray v. Mississippi*, 481 U.S. 648 (1987) ................................................................... 99

*Hall v. Florida*, 572 U.S. 701 (2014) ..................................................................... 5, 26

*Hamilton v. Mullin*, 436 F.3d 1181 (10th Cir. 2006) ................................................. 115

*House v. Bell*, 547 U.S. 518 (2006) ............................................................................ 56

*Irvin v. Dowd*, 366 U.S. 717 (1961) ........................................................................... 96

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002) ............................................. 103, 107, 111

*Malicoat v. Mullin*, 426 F.3d 1241 (10th Cir. 2005) .................................................. 103

*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984) . 96, 97, 98, 100

*Miller-El v. Cockrell*, 537 U.S. 346 (2003).................................................................. 95

*Moore v. Gibson*, 195 F.3d 1152 (10th Cir. 1999) ..................................................... 103

*Moore v. Texas*, 139 S. Ct. 666 (2019) (*Moore II*) ................................................ *passim*

*Moore v. Texas*, 581 U.S. 1 (2017) (*Moore I*) .......................................................... *passim*

*Morgan v. Illinois*, 504 U.S. 719 (1992) ................................................................. 91, 92

*Myers v. Workman,* No. 07-CV-00131-JHP-TLW, 2011 WL 4606699 (N.D. Okla. Sept. 30, 2011) ........................................................................................................................ 55

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001) ................................................ 104, 114

*Nolen v. Oklahoma*, 142 S. Ct. 566 (2021) ......................................................... viii, 1, 2

*Pate v. Robinson*, 383 U.S. 375 (1966) ......................................................................... 58

*Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999) ....................................................... 101

*Payne v. Tennessee*, 501 U.S. 808 (1991) ........................................... 87-88, 88, 90

*Reynolds v. United States*, 98 U.S. 145 (1879) ....................................................... 92, 93

*Romano v. Oklahoma*, 512 U.S. 1 (1994) ................................................................ 88, 90

*Roper v. Simmons*, 543 U.S. 551 (2005) ...................................................................... 56

*Ross v. Oklahoma,* 487 U.S. 81 (1988) .......................................................... 91, 92, 94

*Sasser v. Hobbs*, 735 F.3d 833 (8th Cir. 2013) ........................................................... 14

*Sawyer v. Whitley*, 505 U.S. 333 (1992)...................................................................... 55

*Smith v. Robbins*, 528 U.S. 259 (2000) ....................................................................... 99

*Sparrow v. Leibach*, No. 3:17-cv-00717, 2018 WL 4352710 (M.D. Tenn. Sept. 12, 2018) ........................................................................................................................................ 89

*Spears v. Mullin*, 343 F.3d. 1215 (10th Cir. 2003) ..................................... 79, 80, 88, 113

*Strickland v. Washington*, 466 U.S. 668 (1984) ..................................... 99, 105, 113, 114

*Taylor v. Kentucky*, 436 U.S. 478 (1978) ............................................................. 114-115

*Thornburg v. Mullin*, 422 F.3d 1113 (10th Cir. 2005) ................................................ 113

*United States v. Rogers*, 556 F.3d 1130 (10th Cir. 2009) ........................................... 113

*United States v. Young*, 470 U.S. 1 (1985) ................................................................. 113

*Wainwright v. Witt*, 469 U.S. 412 (1985) ....................................................... 91, 93, 94, 95

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................................ 85

## Federal Statutes

28 U.S.C. § 2254 ................................................................................................ *passim*

## State Cases

*Ex Parte Briseno*, 135 S.W.3d 1 (Tex. Ct. Crim. App. 2004)....................................*passim*

*Lambert v. State*, 126 P.3d 646 (Okla. Ct. Crim. App. 2005) ........................................ 29

*Nolen v. State*, 485 P.3d 829 (Okla. Ct. Crim. App. 2021) ...................................... *passim*

ii

*People v. Harris*, 118 P.3d 545 (Cal. 2005) ................................................... 89

*Wilson v. Kane*, 852 P.2d 717 (Okla. 1993) ................................................ 78

**State Statutes**

Okla. Stat. § 701.10b ............................................................................... 6

Okla. Stat. tit. 10, § 1408(A) ................................................... *passim*

Okla. Stat. tit. 12, § 2 (2011) ................................................... 89

Okla. Stat. tit. 12, § 2403 .................................................... 86, 87, 88

Okla. Stat. tit. 21, §701.10b ................................................... *passim*

Okla. Stat. tit. 22 § 1089 ......................................................... 45

Okla. Stat. tit. 22, § 1175.1 *et seq.* .......................................... 58, 59

**Other**

David A. Bright & Jane Goodman-Delahunty, *Gruesome Evidence and Emotion: Anger, Blame, and Jury Decision-Making*, 30 L. & Hum. Behav. 183, 196 (2006). ................. 83

*Jessica M. Salerno & Hannah J. Phalen, The Impact of Gruesome Photographs on Mock Jurors' Emotional Responses and Decision Making in A Civil Case*, 69 DePaul L. Rev. 633 (2020) ................................................................................. 83

Rule 9.7, *Rules of the Oklahoma Court of Criminal Appeals*, Okla. Stat. tit. 22, Ch. 18, App. (2019).................................................................................. 45

# RECORD REFERENCES

Record references to transcripts and hearings will be designated as follows:

| | |
|---|---|
| O.R. | Ten-volume consecutively paginated Original Record in Case No. CF-2014-1892, followed by page number; |
| Tr. | Nineteen-volume consecutively paginated Jury Trial Transcripts, Case No. CF-2014-1892, followed by page number; |
| Tr. Panel | Jury Panel Voir Dire Transcripts, followed by panel letter and page number; |
| Date Tr. | All other Trial Proceeding Transcripts, followed by page number; |
| St. Ex. | Jury Trial State Exhibit followed by exhibit number; |
| D.A. Br. | Appellant Nolen's Direct Appeal Opening Brief in D-2017-1269; |
| APCR | Application for Post-Conviction Relief, *Nolen v. State*, PCD-2018-215; |
| Att. | Attachment to Habeas Petition followed by page number. |

# TABLE OF ATTACHMENTS

The attachments to the habeas petition are listed below. Some attachments have been previously files in the records, and for the Court's convenience, are attached hereto, as listed.

| Attachment No. | Document Citation in the Record |
|---|---|
| Attachment 1 | Opinion Denying Relief in, *Nolen v. State*, PCD-2018-215 (Okla. Ct. Crim. App. January 27, 2022) |
| Attachment 2 | Elementary Education Records |
| Attachment 3 | Middle School Education Records |
| Attachment 4 | High School Education Records |
| Attachment 5 | Carl Albert Education Records |
| Attachment 6 | Langston University Education Records |
| Attachment 7 | Standardized Testing Records |
| Attachment 8 | Report and C.V. of Daniel A. Martell, Ph.D., A.B.P.P. |
| Attachment 9 | Declaration of Karen Andrews |
| Attachment 10 | Declaration of Jammie Davis |
| Attachment 11 | Declaration of Kenny Golston |
| Attachment 12 | Declaration of Kendra Gross |
| Attachment 13 | Declaration of Kevin Hime |
| Attachment 14 | Declaration of Trudie Johnson |
| Attachment 15 | Declaration of Clyde Nolen |
| Attachment 16 | Declaration of Jeanese Outlaw |
| Attachment 17 | Declaration of Lori Reesing |

| | |
|---|---|
| Attachment 18 | Department of Corrections Records Filed in Original Application for Post Conviction Relief, *Nolen v. State*, PCD-2018-215 (Okla. Ct. Crim. App. August 13, 2020) |
| Attachment 19 | Report of Dr. Daniel J. Reschly, Ph.D. (March 30, 2017) |
| Attachment 20 | Report of Antoinette R. McGarrahan, Ph. D. (May 16, 2016) |
| Attachment 21 | Declaration of Chiquita Richards |
| Attachment 22 **(SEALED)** | **DOCUMENT FILED UNDER SEAL PURSUANT TO ORDER DATED JANUARY 26, 2023 (ECF No. 21)** |

# PROCEDURAL HISTORY PURSUANT TO GENERAL INSTRUCTIONS FOR HABEAS CORPUS ACTIONS UNDER 28 U.S.C. §§ 2241 AND 2254

### A.    State Conviction—CF-2014-1892

| | |
|---|---|
| Court: | District Court of Cleveland County |
| Case No. | CF-2014-1892 |
| Charges: | Count One: First Degree Murder, 21 O.S. § 701; Count Two: Assault and Battery with a Dangerous Weapon, 21 O.S. § 652; Count Three: Assault with a Dangerous Weapon, 21 O.S. § 645; Count Four: Assault with a Dangerous Weapon, 21 O.S. § 645; Count Five: Assault with a Dangerous Weapon, 21 O.S. § 645; Count Six: Assault with a Dangerous Weapon, 21 O.S. § 645 |
| Plea: | Defendant pled not guilty by reason of insanity |
| Trial: | Jury trial from September 5-29, 2017, and October 2-12, 2017. Defendant did not testify. |
| Verdict: | Jury verdict of guilty rendered on September 29, 2017. Jury verdict as to sentence of death rendered on October 12, 2017. The jury found the following aggravating circumstances: (1) the defendant knowingly created a great risk of death to more than one person; (2) the murder was especially heinous, atrocious, or cruel; (3) at the present time, there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society; and (4) the defendant has been previously convicted of a felony involving the use or threat of violence to the person. |
| Sentence: | Formal sentencing occurred on December 15, 2017. Count One: Death by lethal injection; Count Two: life imprisonment; Count Three: 55 years; Count Four: life imprisonment; Count Five: life imprisonment; Count Six: 75 years. |
| Judge: | Cleveland County District Court Judge Lori Walkely |
| Counsel: | Mitchell Solomon, Benjamin Brown, Shay Smith<br>Oklahoma Indigent Defense System<br>P.O. Box 1804<br>Norman, Oklahoma 73101-1804 |

### B.    Direct Appeal—D-2017-1269

| | |
|---|---|
| Court: | Oklahoma Court of Criminal Appeals |
| Case No. | D-2017-1269. Motion for Evidentiary Hearing was denied. |
| Opinion: | *Nolen v. State*, 485 P.3d 829 (Okla. Ct. Crim. App. 2021), affirming judgment and sentence. |
| Certiorari: | Certiorari denied at *Nolen v. Oklahoma*, 142 S. Ct. 566 (2021). |
| Counsel: | James H. Lockard and Lydia Anderson Fields<br>Oklahoma Indigent Defense System<br>P.O. Box 926 |

Norman, Oklahoma 73070

**C.      Post-Conviction Proceedings—PCD-2018-215**

Court:       Oklahoma Court of Criminal Appeals
Case No.:    PCD-2018-215, Application for Post-Conviction filed Sept. 14, 2020
Opinion:     *Nolen v. State*, Case No. PCD-2018-215, Opinion Denying Application for
             Post-Conviction Relief (Okla. Ct. Crim. App. Jan. 27, 2022) (unpublished),
             attached hereto as Attachment 1.
Counsel:     Virginia Sanders
             Oklahoma Indigent Defense System
             Capital Post-Conviction Division
             P.O. Box 926
             Norman, Oklahoma 73070-0926

## STATEMENT OF THE CASE

Alton Nolen was charged in the District Court of Cleveland County, Case No. CF-2014-1792, on September 30, 2014, with murder in the first degree (Count 1), and assault and battery with a deadly weapon (Counts 2 and 3). O.R.1-4.[1] The State sought the death penalty, alleging four aggravating circumstances. O.R.11-12.

On March 25, 2015, based on a defense application for a competency determination, the court ordered an evaluation. O.R.33-38. A bench competency trial was held on October 26 and 27, 2015. At that hearing, defense counsel argued that Mr. Nolen was not competent because he had an intellectual disability (ID) and because of an inability to assist counsel. 10/26/15 Tr. 6; 10/27/15 Tr. 448. The next day, the court found Mr. Nolen competent because he did not meet the statutory definition of "mental retardation," O.R.105, and he was able to rationally assist counsel even if he chooses not to, O.R.105-06.

Mr. Nolen was formally arraigned on February 11, 2016, and informed the judge he wanted to plead guilty. 2/11/16 Tr. 11-12, 20, 28. Defense counsel argued he was not competent to enter a guilty plea. *Id.* at 19. The court entered a plea of not guilty and put off the matter. *Id.* at 25-28. On May 20, 2016, trial counsel advised the court they had concerns about Mr. Nolen's ability to understand and communicate with counsel and had retained an expert who opined that Mr. Nolen was unable to understand and participate in the proceedings because of mental illness. 5/20/16 Tr. 3-4. When the court inquired as to

---

[1] An Amended Information was filed on March 13, 2015: Count 1 and 2 remained the same; Count 3 was amended to assault with a dangerous weapon; and Counts 4, 5, and 6 were added alleging assault with a dangerous weapon. O.R.30-32.

whether Mr. Nolen wanted to enter a plea, he refused to take the witness stand. *Id.* at 6-8. The court explained that he would need to give testimony to enter a plea. *Id.* at 8-11. Defense counsel argued Mr. Nolen was not competent to decide if he should answer questions. *Id.* at 10. Following a lengthy and meandering colloquy with Mr. Nolen, the court ordered Mr. Nolen re-evaluated. *Id.* at 79; O.R.200.

On August 11, 2016, the defense filed a notice of insanity defense. O.R.247-48. Following testimony on August 12, 2016, from multiple experts regarding Mr. Nolen's competency, the court ordered that Mr. Nolen undergo another competency evaluation and that a post-evaluation hearing be held. 8/17/16 Tr. 7. On November 2, 2016, because of Mr. Nolen's refusal to cooperate in any further evaluation, the court ordered he be transferred to the Oklahoma Forensic Center (OFC) for observation. *See* 11/2/16 Tr. 3-4; O.R.362-64.

The court held a second bench competency trial, based on Mr. Nolen's mental illness, from April 3-6, 2017. Fourteen witnesses testified, and the court incorporated evidence from the prior proceedings. *See* 4/3/17-4/6/17 Tr.; O.R.602. The court found Mr. Nolen competent, stating that he was "capable of self-determination." 4/6/17 Tr. 194-95.

The court held a pre-trial *Atkins*[2] hearing on intellectual disability pursuant to Okla. Stat. tit. 21, §701.10b, on April 7, 2017. The evidence from the prior proceedings was incorporated, 4/7/17 Tr. 122, and the defense presented one additional expert on adaptive

---

[2] *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding intellectually disabled individuals ineligible for a death sentence).

functioning. O.R.603. The court found that Mr. Nolen had failed to meet his burden under the statute, 4/17/17 Tr. 247-50; O.R.603.

The trial began on September 15, 2017. At the first-phase (guilt-phase), the defense focused on an insanity defense. On September 29, the jury rejected the defense and found Mr. Nolen guilty on all counts. Tr. 2403-05. A second-phase of trial was held regarding sentencing on the non-capital convictions. The jury assessed sentences of life imprisonment for Counts 2, 4, and 5; a sentence of 55 years for Count 3; and a sentence of 75 years for Count 6 (second phase). Tr. 2475-76.

Defense counsel requested and was granted a separate *Atkins* proceeding (third-phase) before the penalty-phase commenced to determine whether Mr. Nolen was ID and thus ineligible of a death sentence. Tr. 2432, 2490. After presentations by both the defense and the State similar to the pre-trial *Atkins* hearing (and competency hearing), the jury found Mr. Nolen was not intellectually disabled under Oklahoma law. Tr. 3443-44. In the final and fourth-phase, all the guilt-stage evidence was incorporated into the sentencing-phase, Tr. 3514-15. The State presented witnesses to support its case in aggravation, and the defense presented members of Mr. Nolen's family to ask the jury to spare his life and provide additional information about his background. *See, e.g.*, Tr. 3620-21.

The jury sentenced Mr. Nolen to death on Count 1. The court imposed the judgment and sentence on December 15, 2017. *See* 12/15/17 Tr. 7-10.

The Oklahoma Court of Criminal Appeals (OCCA) affirmed Mr. Nolen's convictions and sentence on direct appeal. *Nolen v. State*, 485 P.3d 829 (Okla. Ct. Crim. App. 2021) (*Nolen I*), *cert denied*, 142 S. Ct. 566 (2021). On January 27, 2022, OCCA

denied Mr. Nolen's application for post-conviction relief and remand for an evidentiary hearing in an unpublished opinion. *See* Att. 1.

## STATEMENT OF FACTS

On September 25, 2014, Alton Nolen got into an argument with some coworkers on the line at Vaughan Foods in Moore, Oklahoma. Tr. 771-72; Tr. 876-77. A co-worker claimed that Mr. Nolen made threats; he was then suspended from work. Tr. 942.

Mr. Nolen left work and returned a brief time later. Upon his return, it is undisputed that Mr. Nolen decapitated coworker Colleen Hufford with a kitchen knife, Tr. 515-17. Ms. Hufford was not involved in the prior argument. During Mr. Nolen's attack on Ms. Hufford, multiple workers tried to stop Mr. Nolen, to no avail, Tr. 517, 651-52, 703-04.

It is also undisputed that Mr. Nolen also tried to cut the neck of Traci Johnson, one of the employees who had argued with him. Tr. 886-87, 966. Finally, the company owner, who was an off-duty sheriff, shot Mr. Nolen. Tr. 664, 968.

Additional facts will be discussed within each of the claims below.

**CLAIMS FOR RELIEF**

**I.    PETITIONER IS INTELLECTUALLY DISABLED AND INELIGIBLE FOR THE DEATH PENALTY UNDER *ATKINS V. VIRGINIA* AND ITS PROGENY.[3]**

      **A.    Introduction and Legal Standard**

In *Atkins*, the Supreme Court ruled that the Eighth and Fourteenth Amendments categorically bar the execution of intellectually disabled (ID) individuals, and that the Constitution places a "substantive restriction" on the State's power to "take the life" of an intellectually disabled offender. 536 U.S. at 321. To define ID, the Court cited then-current diagnostic guides published by the American Association on Intellectual and Developmental Disabilities (AAIDD) and American Psychiatric Association (APA). *Id*. at 307 n.3; *see also Hall v. Florida*, 572 U.S. 701, 720 (2014) ("The clinical definitions of intellectual disability . . . were a fundamental premise of *Atkins*.").

In *Moore v. Texas*, 581 U.S. 1 (2017) (*Moore I*), the Supreme Court held that current diagnostic standards are binding in *Atkins* proceedings. *Id.* at 20 (current diagnostic standards impose "one constraint" on states' leeway in adjudicating *Atkins* claims). Citing the then-current manuals from APA and the AAIDD, *Moore I* further held that "[r]eflecting improved understanding over time, . . . current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians." *Id.* (internal quotations omitted).

---

[3] Mr. Nolen raised this claim on pages 6-14 of his direct appeal brief and on pages 1-11 of his application for postconviction relief.

5

The APA, AAIDD, and Oklahoma law, 21 Okla. Stat. § 701.10b, enumerate three prongs relevant to a finding of intellectual disability: (1) deficits in intellectual functioning (prong one), (2) deficits in adaptive functioning (prong two), and (3) onset during the developmental period (prong three). The AAIDD's current diagnostic standards are set forth in *Intellectual Disability: Definition, Diagnosis, Classification, and Systems of Supports—12th Ed.*, AAIDD (2021) (AAIDD-2021), and *The Death Penalty and Intellectual Disability*, AAIDD (2015) (AAIDD-2015). At the time of Petitioner's trial and post-conviction proceedings, the AAIDD's most recent diagnostic manuals were AAIDD-2015, *Intellectual Disability: Definition, Diagnosis, Classification, and Systems of Supports—11th Ed.*, AAIDD (2010) (AAIDD-2010), and the 2012 *Users Guide* to AAIDD-2010 (AAIDD-2012). The APA's most-recent diagnostic manual is the *Diagnostic and Statistical Manual of Mental Disorders, 5th Edition—Text Revision* (DSM-5-TR). At the time of Petitioner's state court proceedings, the APA's most recent diagnostic manual was the *Diagnostic and Statistical Manual of Mental Disorders, 5th Edition* (DSM-5). All of the above authorities state that a diagnosis of intellectual disability is established when prongs one through three are met.

Mr. Nolen is entitled to relief under *Atkins* based on the evidence presented and the diagnostic standards in place during state court proceedings. He established all three prongs of the diagnosis and OCCA's rulings in *Nolen I* and *Nolen II* were unreasonable under 28 U.S.C. § 2254(d). Mr. Nolen is also entitled to relief based on new evidence and diagnostic standards that were not considered by the state court.

**B.  Petitioner Is Entitled to *Atkins* Relief Based on the Evidence Presented During His State Court Proceedings.**

Petitioner satisfies all three prongs of the diagnosis of intellectual disability under both the diagnostic standards and Oklahoma's capital sentencing statute: he has deficits in intellectual functioning, as shown by two scores in the presumptive range for intellectual disability on the gold-standard of intelligence quotient (IQ) testing; significant deficits in adaptive behavior as reflected in neuropsychological testing that directly assessed his cognitive abilities, the accounts of third-parties with knowledge of his functioning, extensive records documenting his impairments, and formal testing of adaptive behavior; and, an age-of-onset that is well before the age-of-18 cutoff that was in place at the time of his trial and post-conviction proceedings.

**1.  Significantly Subaverage Intellectual Functioning**

Significantly subaverage intellectual functioning is defined as an IQ of approximately 70 or below on an individually administered and comprehensive test of intellectual functioning. DSM-5 at 37. This score must be considered with the margin for error or "confidence interval" that is present for all IQ testing and derived from the standard error of measurement (SEM). An IQ score is within the presumptive range for intellectual disability under the diagnostic and constitutional standards governing *Atkins* claims when that score has an SEM range with a "lower end" that includes "scores at or below 70." *Moore I*, 581 U.S. at 14. Because the margin for error established by the SEM for most IQ tests is plus or minus 5 points, scores of 75 and below fall within the presumptive range for ID. DSM-5 at 37; *Brumfield v. Cain*, 576 U.S. 305, 315 (2015); Tr. 3375-77.

Section 701.10b defines prong one as "an intelligence quotient of seventy (70) or below," and states that "in determining the intelligence quotient, the standard measurement of error for the test administrated shall be taken into account." §§ 701.10b(A) and (C). OCCA has held that, consistent with *Moore I*, any IQ test score where the lower end of the range established by the SEM "falls at or below 70, is within the range required to demonstrate significantly subaverage intellectual functioning." *Nolen I*, 485 P.3d at 839.

Mr. Nolen has established that he suffers from significantly subaverage intellectual functioning through two individually administered and comprehensive tests of intelligence. In 2015, psychologist Jeanne Russell, Ed.D., administered a Wechsler Abbreviated Scale of Intelligence, 2nd Edition (WASI-II), in an effort to screen for evidence of deficits in intellectual functioning. Tr. 2513. As Mr. Nolen's score on that test was low, Dr. Russell then administered the Wechsler Adult Intelligence Scales, 4th Edition (WAIS-IV), which is an individually administered and comprehensive test of intelligence. Tr. 2514. Because certain subtests of the WASI-II overlapped with portions of the WAIS-IV, consistent with a directive from the publisher of the WAIS-IV and WASI-II, Dr. Russell relied on scores from certain subtests of the previously administered WASI-II in scoring the WAIS-IV. Petitioner received a full scale IQ score of 69. Tr. 2514-26.

In 2020, psychologist Susan Shields, Ph.D., who was employed by the Oklahoma Department of Corrections (DOC), administered a second WAIS-IV to Mr. Nolen. He received a full scale IQ score of 65 on that test. Att. 18 at 500. Because both of the scores themselves, let alone the margins for error for those scores, are at or below 70, these scores satisfy prong one individually and when considered together.

OCCA found prong one to be present. Even without the benefit of the second WAIS-IV—which had not yet been administered—the court held that "[b]ecause the lower end of Nolen's score range falls at or below 70, which is within the range required to demonstrate significantly subaverage intellectual functioning, we move on to consider Nolen's adaptive functioning." *Nolen I*, 495 P.3d at 839. *Nolen II* confirmed that, even without the benefit of the second test, on direct appeal it had found "that evidence of an IQ test administered to Nolen [in 2015] was within the range required to demonstrate significantly subaverage intellectual functioning." Att. 1 at 5.

### 2. Significant Deficits in Adaptive Functioning

Adaptive functioning has been defined as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM-5 at 37. The adaptive behavior criterion is satisfied when deficits are present in at least one of the three following domains: conceptual, social, or practical. DSM-5 at 37; AAIDD-2010 at 43.

Employing outdated criteria for prong two that were last set forth in obsolete diagnostic manuals that were later abandoned by the AAIDD in 2002 and by the APA in 2013, *see* Section I(C)(4), *infra*, Oklahoma's capital sentencing statute states that the adaptive functioning prong of an *Atkins* claim is established when "there are significant limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health, safety, functional academics, leisure skills and work skills." § 701.10b(A).

Adaptive deficits are measured through formal testing that is administered to a third party with knowledge of the individual's functioning; descriptions of the individual's adaptive behavior given from others; neuropsychological and achievement testing; and record review. DSM-5 at 37-38; AAIDD-2010 at 51; AAIDD-2012 at 18. As set forth below, Mr. Nolen suffered from significant adaptive deficits under the then-current and scientifically valid three-domain system, as well as the outdated eleven-skill-area system employed under Oklahoma state law.

### a.    Formal Test of Adaptive Behavior

Dr. Russell administered the Vineland Adaptive Behavior Scales, 2nd Edition (Vineland-II), a formal test of adaptive behavior, to Paige Nolen, Petitioner's younger sister.[4] Tr. 2536-37. The Vineland-II returned a score for an overall composite of Petitioner's functioning, as well as scores for Communication, Socialization, and Daily Living, which correspond to the conceptual, social, and practical domains, respectively. Mr. Nolen received a score of 65 for his overall functioning, 69 in Communication (the conceptual domain); 62 in Socialization (the social domain); and 70 in Daily Living (the practical domain). Comp.-1 Tr. 29-33; Att. 19 at 29 (Reschly Rep.); Tr. 2840. As with IQ testing, scores of approximately 70 or below, with a margin for error derived from the SEM, constitute scores within the range of ID. Tr. 2840. An individual only needs one ID-range score on a test of adaptive behavior to reflect significant deficits in that domain.

---

[4] For clarity, Petitioner uses first names when discussing multiple members of the Nolen family.

AAIDD-2010 at 43. Mr. Nolen received intellectual-disability-range scores in all three domains. *See* Tr. 2543-44; Tr. 2840.

### b.     Conceptual Domain

### i.     Academic Functioning

Mr. Nolen had a long history of impaired academic functioning that began during the developmental period. In kindergarten, he scored in the bottom 4th percentile on the Kindergarten Metropolitan Pre-Reading Composite, a test that assesses the ability to read before going into first grade. Tr. 2877. His performance was so poor that the school recommended he be retained. Tr. 2916, 3364, 3628. He was only promoted at the insistence of his mother. Tr. 3628. The next year, Mr. Nolen's cousin and classmate Crystal Green recalled that he was "nowhere close to being ready to move beyond the 1st grade." Tr. 2877. Consistent with Ms. Green's impression, Mr. Nolen was, in fact, retained in the first grade. Tr. 2877. As Mr. Nolen grew older and teachers became more accurate in their grading, he fell further behind his peers; his academic achievement declined throughout elementary school. Tr. 2880-82. While no records exist for his time in middle school, classmates report that he was sent to a self-contained classroom for slow learners, indicating—at a minimum—that he received support in a remedial program. Tr. 2673-75; Tr. 2733; Tr. 2883-84 (indicating Petitioner's sisters Paige and Megan Nolen and his friend Shamichael Poindexter all believed he was in special education).

Despite remedial programing, Mr. Nolen continued to struggle academically. His sister Paige helped him with his homework throughout his academic career, even though she was almost three years younger than him. Tr. 2730-37. He had great difficulty

understanding his schoolwork, even though Paige found it to be easy and she made repeated attempts to teach him. Tr. 2732-35. He had particular problems reading, both in sounding out the words and understanding what he read. Tr. 2736-38. Megan, who was more than three years younger than Mr. Nolen, also helped him with his schoolwork and reported that he had significant problems learning. Tr. 10/27/15 at 204-10.

Mr. Nolen's "pattern of declining achievement continued and in high school Nolen did poorly, generally receiving failing or near failing grades." *Nolen I* at 841. In ninth grade, he received 6 Fs, 4 Ds, a C, and 3 As. *See* Att. 4 at 1. Two of the As were in Football, and the other A and C were in Business/Computer Applications, which was a "typing class." Tr. 2638-29, 3110, Att. 4 at 1. In every academic class he took that year—English, Math, History, and Physical Science—he received either an F or a D each semester. *Id.*

Given this dismal record, he was shunted towards the Booker T. Washington Academy (the Academy), which was a self-contained school designed to help at-risk students, including students who were behind academically. Tr. 2638-42; Tr. 2739-40. Students at the Academy received significant academic supports that were not in normal classrooms in the mainstream high school. Classrooms were much smaller at the Academy, and students received far more one-on-one attention from teachers. Tr. 2644-45. The schoolwork was also far more basic than in normal classes: Crystal Green, who was also a student at the Academy, reported that the work there was at the third- and fourth-grade level even though all of the Academy students were high-school age. Comp.-1 Tr. 195-200; Tr. 2886-87; Tr. 2887 (recalling Nolen working on addition, subtraction, and multiplication while at the Academy). There were also no benchmarks, time limits, or

required level of achievement at the Academy: each student was provided with a packet and worked through the packet at his or her own pace. Tr. 2887, 3096-97.

Even with the level of support and basic nature of the academic work at the Academy, Mr. Nolen still showed impairments. He stood out among his Academy classmates as someone who had trouble understanding the elementary school-level skills that were being taught, was easily frustrated academically, and struggled with basic tasks, such as reading out loud in class. *See* Tr. 2898; 2908.

Consistent with Mr. Nolen's impairments and given the additional support and lax grading requirements, his grades showed some improvement. Tr. 3088-99, 3110. But even with Academy-level courses and assistance, he only had a GPA of 2.09 in high school, and that 2.09 was misleading. D-1. He received As and one B for his participation in football and track that were weighted and incorporated into his overall GPA. Tr. 3098-99. Absent those non-academic grades, he would have had a GPA that was closer to 1.0, a D average. Tr. 3099-3100; 3358-59.

Standardized testing confirmed Nolen's impairments. During his second year in the first grade, he was given the Iowa Tests of Basic Skills (ITBS), which was a group-administered achievement test administered by his elementary school. Tr. 2878-79. Because the ITBS was normed by grade rather than age and Mr. Nolen was in his second year of first grade when he took the ITBS, his score on this test was inflated and continued to be inflated each time he took it. *See* Tr. 2879-80. He scored 60 percent overall on the ITBS when he took it for the first time in the first grade. Tr. 2877-80. As he went through elementary school, his standardized testing reflected "a steady progression of his scores

13

declining." Tr. 2879; Tr. 3556. The last ITBS he took was in the fifth grade, when he received an overall score in the bottom 8th percentile. 10/27/15 Tr. 261. Group-administered testing like the ITBS can identify general trends, and the trend of Mr. Nolen's testing was one of decline. Tr. 2879.

Mr. Nolen's scores in standardized testing declined even further in high school. As a sophomore in high school, he took a PLAN pre-ACT test. He scored in the bottom 1st, 2nd, 4th and 7th percentiles in Reading, Science Reasoning, English, and Math, respectively. Att. 4 at 2. His comprehensive score was in the bottom 1st percentile. Att. 4 at 2; Tr. 2646-47. He took three End-of-Instruction (EOI) tests in his sophomore and junior years, which were designed to determine if he met the basic levels of proficiency needed to graduate. Tr. 2649-50. Mr. Nolen failed each one of these tests. Tr. 2652-53.[5]

This pattern of decline is precisely what would be expected of a student with ID. "[I]individuals with mild mental retardation 'often are not distinguishable from children without Mental Retardation until a later age.'" *Sasser v. Hobbs*, 735 F.3d 833, 848 (8th Cir. 2013). But because of their cognitive deficits, they develop more slowly than their peers and fall further and further behind as age-related expectations increase. Nolen's testing profile and academic history follow this trend.

---

[5] While Alton never achieved a passing grade on the EOI tests, this did not prevent him from graduating. Idabel School District, where Mr. Nolen attended school, provided alternative means for a student to graduate if he or she failed to pass the EOI tests. Tr. 2650-51.

After graduating from high school, Nolen made two attempts to attend college. He enrolled at Carl Albert State College and then Langston University. While both of these schools required students to take the ACTs, "each had open admissions policies allowing students' admissions regardless of their ACT scores." *Nolen I*, 485 P.3d at 841 n.13. The schools, instead, relied on standardized testing such as the ACT to determine if a student was ready for credit coursework or needed to be placed in remedial courses. Tr. 2893-94. Mr. Nolen received a composite score of 12, which is in the bottom 4th percentile on the ACT. Tr. 2531-32; Tr. 2892. In both institutions, he was found to be deficient and placed in "developmental" classes, which carried no credit, were designed to help him overcome prior deficits in his academic skills, and taught him such skills as basic reading and basic arithmetic. *Id.* at 841; Tr. 2893-94. He still did poorly, receiving D's and F's in these classes.[6]

Additionally, when Mr. Nolen was incarcerated prior to his present incarceration in 2011, he was administered a Test of Adult Basic Education (TABE) by the DOC, which was designed to determine if an inmate was ready to test for the GED diploma. Tr. 2529. Although this test is a basic literacy test, he still received impaired scores: in math

---

[6] *Nolen I*, 485 P.3d at 841. As set forth in Section I(E)(1), *infra*, records reflected that Petitioner actually did worse than simply D's and F's in his developmental classes. At Carl Albert, he took three developmental courses and one computer science course. He failed all four of these courses and dropped out of school. At Langston, he either failed or dropped out of his developmental classes, failed the regular English classes that he was placed in, and only received passing grades in classes that required few academic skills to pass. In fact, Academic Achievement, which the *Nolen I* court cites as an example of an "A" that Petitioner received, was designed to teach basic and rudimentary study habits.

computation, he tested at the 3rd grade, 9th month; in applied math, he tested at the 5th grade, 8th month; in total math, he tested at the 4th grade, 8th month; in reading, he tested at the 6th grade, 9th month; in language, he tested at the 9th grade, 9th month; and in the overall composite, he tested at the 6th grade, 1st month. Tr. 2529. Accordingly, at 26 years of age and having received intensive supports in the Academy as well as remedial courses at both Carl Albert State and Langston Universities, Mr. Nolen still scored at the 6th grade or below on almost all of the measures on the TABE.

Finally, Mr. Nolen exhibited deficits in academic functioning on an individually-administered achievement test—the Wide Range Achievement Test – 3rd Edition—given by Dr. Shields. *See* Att. 18 at 501 (Shields Rep.). He scored in the bottom 16th percentile in word-reading, which requires only that the individual correctly sound out words. He also scored in the bottom 1st percentile on arithmetic. *Id.* While he received an average score in spelling, this test only assesses the ability to correctly spell words and requires few conceptual skills. *Id.* Neuropsychologist Antoinette McGarrahan, Ph.D., who conducted a neuropsychological assessment of Petitioner prior to his trial, administered achievement testing to him as well. The scores on Dr. Shields's achievement testing are consistent with the results of the achievement testing given by Dr. McGarrahan, where Petitioner scored in the average range for spelling, but in the bottom 7th percentile in sentence comprehension and in the bottom 12th percentile in word-reading.[7] Although Dr.

---

[7] Att. 20 at 7 (McGarrahan Rep.). Petitioner also received an impaired score on mathematics, but Dr. McGarrahan rejected this score due to poor effort.

McGarrahan noted issues with Petitioner's effort on her testing and the validity of the testing results given his mental illness, *see, e.g.*, Tr. 1630-32, 8/12/16 Tr. 105-06, 112, those issues did not encompass Petitioner's reading comprehension and word-reading scores. Att. 20 at 7 (McGarrahan Rep.). And, regardless of the validity of Dr. McGarrahan's testing, Dr. Shields's testimony was found to be valid and reflected the same impairments. *See* Att. 18 at 500-02 (Shields Rep.).

The DSM-5 defines functional academic deficits for individuals in the mild range of intellectual disability as follows: "[f]or school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in *one or more* areas to meet age-related expectations." DSM-5 at 34 (emphasis added). The deficits above demonstrate that Petitioner required and received support in *all* areas of academic functioning and still failed to meet age-related expectations.

## ii.      Executive Functioning and Self-Direction

Mr. Nolen has been described as "just kind of slow," Tr. 2721, and someone with an obvious mental deficit, Tr. 2718. He had difficulty learning, problems understanding instructions, and needed repeated redirection in order to complete a task correctly. *See* Tr. 2677-78, 2736. He had poor judgment and decision-making skills and struggled to understand normal interactions with his peers. Tr. 2829-30. Petitioner had difficulties coping and limited frustration tolerance. Whether in the context of his difficulties learning in school or understanding others in conversation, *see* Section I(B)(2)(c), *infra*, if he failed to learn a task or understand others, he frequently withdrew and shut down. *See* Tr. 2736.

Neuropsychological testing, administered by the DOC, confirms the presence of these deficits. In addition to the IQ testing discussed above, Dr. Shields administered a neuropsychological battery to Petitioner and concluded that he had cognitive deficits in his processing speed—i.e., the speed at which he can perform a cognitive task—as well as deficits in judgment, attention, orientation, and construction (spatial reasoning). *See* Att. 18 at 501 (Shields Rep.). All of these impairments are consistent with the behavioral evidence of self-direction. The results of Dr. Shields's testing are consistent with neuropsychological testing conducted by Dr. McGarrahan, which reflected similar impairments. Att. 20.

### iii. Communication

Mr. Nolen also had deficits in both expressive and receptive communication. Throughout his life, he had difficulty expressing himself verbally, was described as quiet and withdrawn, and had difficulties holding a conversation. Tr. 2675, 2721, 2724. He also had difficulty understanding others, frequently laughed in an ineffective attempt to hide his lack of understanding, and often asked those he trusted to explain what was discussed during a conversation after the conversation had ended. Tr. 2675-76, 2721, 2739, 2904. Neuropsychological testing, again, confirmed the presence of these deficits. Dr. Shields administered tests of verbal fluency, which returned scores below the bottom 1st percentile. Att. 18 at 501-02 (Shields Rep.). Because expressive and receptive verbal communication occurs in real-time, Nolen's observed deficits in communication are also consistent with his impairment in processing speed.

### c.  Social Domain

Mr. Nolen was described as gullible, easily taken advantage of, and exercising poor judgment in people. Tr. 2829-30; Tr. 2905-06; Tr. 2909-10. He was teased in middle school and high school for his inability to learn, his academic impairments, and his gullibility. Tr. 2677-78; Tr. 2908-10. He was frequently embarrassed at the presence of his intellectual and adaptive impairments and took great care to conceal them. Tr. 2904; Tr 2907-08. At a time when it was age-appropriate for teenagers to socialize in groups, he was withdrawn and socially awkward, had difficulties reading social cues, and had difficulties understanding and carrying on a conversation. Tr. 2724; Tr. 2899-2900.

Additionally, although Petitioner professed to be a practitioner of Islam, he had a very limited understanding of Muslim theology or beliefs, misquoted the Quran and made a variety of inaccurate statements regarding Islam during the interview with law enforcement that followed his arrest for this crime. Tr. 1429, 1487-88, 1494, 2910-11.

He also had impairments with social judgment. Being able to communicate verbally, work through problems, and negotiate compromises is a fundamental skill in social problem solving. Tr. 2913-14. Whether through his impairments in verbal communication alone or a deficit in the coping skills needed to engage in these negotiations, Nolen failed to engage in that process and was unable to negotiate or communicate with people holding opposing viewpoints. Tr. 2913-15. He was also emotionally unstable and would throw "tantrums" as a teenager for no apparent reason. Tr. 3633-34.

His leisure skills were also limited. Because he was strong and a good athlete, he was a decent football player during high school. But he had difficulty following the coach's

instructions and remembering the plays, and had to be told where to go on the field. Tr. 2677-81; Tr. 2705-07. Eventually, he was placed in the nose guard position, which was less complex than most other positions, and was part of the defense, which did not involve difficult plays to learn. Tr. 3102; Tr. 3192.

### d.    Practical Domain

Mr. Nolen had poor money concepts and had difficulty calculating correct change. While he was at the Academy, he received instruction and hands-on training in Life Skills classes on how to engage in basic tasks such as applying for a job, renting an apartment, and opening and managing a bank account. Tr. 2643-44; Tr. 3109. But he still required support in those areas as an adult; his sister Paige provided significant support. He was able to get a bank account on his own, and was very proud of that fact, but never wrote a check and Paige had to show him how to use an ATM card. Tr. 2748, 2750-51. His cooking skills were limited; even as an adult, he could only make ramen noodles or sandwiches. Tr. 2747. He did not understand how to pay bills, as he could not understand that utility bills would fluctuate and would only pay the amount of the previous bill. Tr. 2743-44. When he eventually bought a car, he did not understand that he needed a driver's license in order to get car insurance, and Paige had to place his car on her insurance. Tr. 2744-45. Paige also had to help him get the tags for the vehicle. Tr. 2745-47.

For the vast majority of Mr. Nolen's adult life, he failed to live independently. He would move from relative or friend to relative or friend. *See, e.g.*, Tr. 2720, 2725, 2743, 2750, 2760-61. Though he lived by himself prior to his arrest on this case, his apartment was "sparsely furnished," his furniture was still wrapped in plastic, the bed frame had no

mattress, and there was no sign of a sleeping bag or bedding. *See* Tr. 2940-42. He needed

assistance washing his clothes and did not understand the cost of laundry. Tr. 2768-69.

Petitioner's employment history was similarly indicative of impairments. When he

did work, his jobs were either unskilled or semi-skilled positions where "you pretty much

do the same thing every day," Tr. 2920-21, for example, cutting tomatoes and stirring

bruschetta at a Vaughan Foods, or cleaning tables at a cafeteria. Tr. 2741, 3175.

As discussed in detail below, adaptive behavior is defined as an individual's

functioning within the community, as opposed to living with the supports present in a

structured environment such as prison. *See* Section I(C)(1), *infra.* Accordingly, it is not

appropriate to rely on prison functioning to assess someone's adaptive functioning. *Id.* That

being said, even in the highly structured living environment created while on death row,

Mr. Nolen has exhibited significant deficits in adaptive functioning. While his case was

pending on direct appeal, Mr. Nolen showed clear impairments in communicating with

DOC staff.[8] He also had ongoing personal hygiene problems, had issues keeping his cell

clean, and spent many days covered by his blanket.[9] He refused to touch items with his

---

[8] Att. 18 at 13-14, 16, 19, 27, 31, 36, 49-50, 57, 59-61, 63, 66-68, 70-71, 73, 76-77, 86, 96, 104, 109, 117, 120, 123, 129, 131, 138, 142, 146-50, 161-62, 165, 317-21, 340, 349-51, 358, 398-401, 413, 514-16, 519, 524, 536, 546, 559, 576, 583, 593, 595, 599, 601, 611-12, 623, 625, 642, 644, 649, 655-60, 663, 668, 670, 673-74, 684, 695, 700, 704-07, 710-13, 718-19, 723-24, 729, 737, 743-44, 748, 754, 757, 761, 765-69, 772-76, 780, 783-86, 796, 807, 812.
[9] Att. 18 at 13, 16, 19, 21, 22, 24, 27, 29-31, 37-38, 44, 49, 53, 56, 59, 62-63, 70-71, 76, 104, 120, 127, 130-35, 139, 144-45, 147, 149-50, 154, 157, 163, 314, 317, 516, 596, 626, 639, 643, 647, 653, 655-56, 685, 695, 697, 700, 706, 710, 738, 751, 754-76, 794-96, 807, 810, 812.

bare hands for no discernable reason.[10] He failed to return his meal trays and hoarded as many twenty-there trays in his cell.[11]

> **e.    Petitioner Meets Prong Two under Diagnostic Standards and § 701.10b.**

Under the three-domain system employed by the diagnostic manuals, Dr. Reschly concluded that Mr. Nolen had significant deficits in the conceptual and social domains. Tr. 2896, 2917. While Mr. Nolen also had deficits in the practical domain, Dr. Reschly did not conclude that those deficits were significant. Tr. 2924.

In addition to establishing significant adaptive impairments under the then-current diagnostic standards, Nolen also met prong two under Oklahoma's capital sentencing statute. As Drs. Russell and Reschly testified, the adaptive impairments discussed above also established significant impairments in functional academics, self-direction, communication, social skills, leisure skills, use of community services, health and safety, and work. Tr. 2544, 2948-51.

> **3.    Age of Onset**

At the time of Mr. Nolen's post-conviction proceedings, the age-of-onset requirement was prior to the age of 18. The DSM-5, which was the APA's most recent diagnostic manual, did not specify a particular age and required only that the age-of-onset be in the developmental period. DSM-5 at 33. The AAIDD still defined the developmental period operationally as prior to age 18.

_____

[10] Att. 18 at 52, 60, 86, 651, 657, 763, 769.
[11] Att. 18 at515-17, 522, 656, 576-79, 598, 607, 612, 625-28, 710, 724, 737-40.

Mr. Nolen meets this threshold. He had significant adaptive deficits before the age of 18, which correlate with the neuropsychological deficits reflected in Dr. Shields's evaluation. He has a number of risk factors for intellectual disability, which corroborate the pre-18 onset of his intellectual and adaptive deficits. He also demonstrated a significant downturn on standardized achievement tests during the developmental period, which is further evidence of pre-existing deficits. Nor is there an intervening post-18 explanation for the intellectual and adaptive deficits reflected in two rounds of IQ testing, achievement testing, and neuropsychological testing. Mr. Nolen's longstanding deficits satisfy prong three.

## C.    State Court Opinions

A state court's denial of relief is not entitled to deference under § 2254(d) if the state court's ruling (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Here, the state court's denial of Petitioner's direct appeal was unreasonable under 28 U.S.C. § 2254(d)(1) and (d)(2). When Mr. Nolen challenged the jury's denial of his *Atkins* claim on direct appeal, the OCCA concluded that Dr. Russell's IQ score of 69 met prong one of the diagnosis, and that consideration of prongs two and three was warranted. *Nolen I*, 485 P.3d at 839. OCCA noted that the defense offered testimony from Drs. Reschly and Russell, both of whom had diagnosed Mr. Nolen with intellectual disability, and the prosecution had presented testimony from psychologist Jarrod Steffan, Ph.D., who

contested that diagnosis. *Id.* at 841-45. The court identified a number of criticisms made by Dr. Steffan in connection with his analysis of prongs two and three, and concluded that the jury's findings were reasonable. *Id.* at 844. As set forth below in section 1, *infra*, these determinations were contrary to or an unreasonable application of the Supreme Court's *Atkins* precedent, based on unreasonable determinations of fact, or both.

In state post-conviction proceedings, Mr. Nolen sought a remand for an evidentiary hearing based on the results of Dr. Shields's 2020 assessment as well as additional evidence of his poor adaptive functioning after being sentenced to death. Petitioner argued that Dr. Shields's IQ testing confirmed that he met prong one. APCR at 10. He further argued that, even though prison is a controlled setting and functioning in prison cannot be used to assess adaptive functioning, the fact that he functioned poorly even in such a controlled setting as prison provides additional evidence of his adaptive deficits. APCR at 7-9. Relying on its analysis in *Nolen I*, OCCA held that the new evidence of intellectual disability did not merit a remand because it had already found prong one to be met, and the new evidence of poor adaptive functioning while in prison had no relevance as to the presence of adaptive deficits while out of custody. Att. 1 at 4-6. It therefore denied relief without an evidentiary hearing. *Id.* But because the *Nolen I* analysis violated § 2254(d), *Nolen II*'s denial of relief was unreasonable under § 2254(d) as well. Furthermore, because the *Nolen II* court ignored the significant of the new evidence proffered in post-conviction, the denial of a hearing was based on an unreasonable finding of fact.

Finally, both *Nolen I* and *Nolen II* employed an out-of-date definition of intellectual disability. As *Moore I* roundly rejected the use of obsolete medical standards in an *Atkins* determination, the analysis in both decisions was contrary to *Atkins*.

      1.      **The State Court's Denial of Relief Was Contrary to or an Unreasonable Application of *Hall*, *Brumfield*, *Moore I* and *Moore II*, and Based on Unreasonable Findings of Fact.**

In *Moore I*, the Supreme Court held that current diagnostic standards are binding in an *Atkins* claim. 581 U.S. at 20 (current diagnostic standards supply "one constraint" on States' leeway in adjudicating *Atkins* claims). Citing the then-current diagnostic manuals issued by the APA and AAIDD, *Moore I* further held that "[r]eflecting improved understanding over time, . . . current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians." *Id.* (internal quotations omitted). The *Moore I* Court then considered several practices employed by the Texas Court of Criminal Appeals in the assessment of *Atkins* claims. *Id.* at 15-21. These included, inter alia, (1) basing an adaptive behavior analysis on strengths rather than weaknesses, (2) using comorbid diagnoses to explain away deficits, (3) using risk factors for intellectual disability to undermine an *Atkins* claim, (4) viewing a defendant's presence in "normal classrooms" (as opposed to special education) during his or her school career as inconsistent with intellectual disability, (5) reliance on the defendant's functioning in prison, and (6) employing any of the so-called *Briseno*[12] factors in an *Atkins* claim. *Id.* Because those practices deviated from then-current diagnostic standards as set forth by the

---

[12] *Ex Parte Briseno*, 135 S.W.3d 1 (Tex. Ct. Crim. App. 2004).

APA and the AAIDD, *Moore I* rejected these practices as unconstitutional and held that they created an "unacceptable risk" that an intellectually disabled person would be erroneously denied relief and executed. *Id.*

The Supreme Court considered Moore's case a second time in *Moore v. Texas*, 139 S. Ct. 666 (2019) (*Moore II*), after his *Atkins* claim was considered and rejected on credibility grounds by the lower court following the remand in *Moore I*. *Id.* at 670. Because the lower court's credibility determinations employed analyses that were contrary to current diagnostic standards, *Moore II* rejected those determinations and granted *Atkins* relief. *Id.* at 670-72.

The rule established by *Moore I* and confirmed by *Moore II* was the culmination of pre-existing Supreme Court authority on what standards can be employed in an *Atkins* determination. In *Hall*, the Court considered Florida's imposition of a hard IQ cutoff of 70 that failed to consider the margin for error built into intelligence testing. 572 U.S. at 704. Because that cutoff deviated from diagnostic standards, the Court held that it created an "unacceptable risk" that an individual with intellectual disability would be executed and was thus unconstitutional. *Id.* at 704, 712-14. In *Brumfield*, the Court considered a state court's intellectual-disability analysis when determining if a federal district court appropriately granted *Atkins* relief in habeas proceedings. 576 U.S. at 312. Because the state court's determination violated diagnostic standards, the Supreme Court held that the state court's rejection of the *Atkins* claim constituted an unreasonable determination of the facts. *Id.* at 313, 317-22. Through *Moore I*, *Moore II*, *Hall*, and *Brumfield*, the Supreme Court has made current diagnostic standards binding in *Atkins* claims.

OCCA issued rulings in *Nolen I* and *Nolen II* that were contrary to, or an unreasonable application of, *Moore I*, *Moore II*, *Brumfield*, and *Hall* because they violated then-current diagnostic standards, employed a number of the diagnostically inappropriate practices that were specifically rejected by *Moore I*, and employed procedures that—if allowed to stand—would create an unacceptable risk that an intellectually disabled defendant would erroneously be denied *Atkins* relief and executed.

Furthermore, *Nolen I* and *II* were based on an analysis of testimony that was contrary to the record, and thus, constituted unreasonable factual determinations.

### a.     Adaptive Functioning

As to prong two, OCCA in *Nolen I* relied on the fact that that Dr. Steffan testified that "the average reading level in the United States is sixth grade, which is precisely the level at which Nolen scored" on the TABE and that Nolen's overall score placed him in the average range. 485 P.3d at 843. While Dr. Steffan "acknowledged the differences between Nolen's test scores on the IQ test, the Vineland II, and TABE," OCCA in *Nolen I* further relied on the fact that Dr. Steffan claimed that the high test scores would be a result of "best effort" on Nolen's part and the lower scores would be the result of lower effort. *Id.* OCCA further noted Dr. Steffan's reliance on a letter purportedly written by Nolen while in prison which included grammatical and typographical errors but adequately communicated its point to the reader. *Id.* Finally, OCCA relied on the fact that Dr. Steffan acknowledged the presence of adaptive deficits in areas other than academic functioning and communication, but ascribed those to a personality disorder rather than intellectual disability. *Id.* at 844. For these reasons, it held that "the jury could have found that Nolen

failed to demonstrate, by a preponderance of the evidence, that he had significant limitations in two or more of the enumerated adaptive skill areas." *Id*.

OCCA's reliance on these aspects of Dr. Steffan's testimony was contrary to, or an unreasonable application of, *Moore I and II*, *Brumfield*, and *Hall*, and an unreasonable finding of fact for a number of reasons.

*First*, OCCA's reliance on the presence of Nolen's purportedly average scores on the TABE and the content of his letter from prison violated *Moore I*, *Moore II*, and *Brumfield* because it focused on Petitioner's purported strengths, rather than his deficits. People with intellectual disability may have "strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation." *Brumfield*, 576 U.S. at 320 (citing AAIDD-2002). For this reason, "the medical community focuses the adaptive-functioning inquiry on adaptive deficits" rather than strengths. *Moore I*, 581 U.S. at 15. Accordingly, *Moore I* rejected reliance on strengths, rather than deficits, when making a prong-two analysis. *Id.* ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills" (quoting AAIDD-2010 at 47)). By focusing on what Mr. Nolen purportedly *could* do rather than what he *did not do*, OCCA's analysis violated then-current diagnostic standards and *Moore I*'s directive that an adaptive behavior analysis must rely on deficits rather than strengths.

*Second*, OCCA violated *Moore I and II* and *Brumfield* by relying on the fact that Dr. Steffan "diagnosed Nolen with unspecified personality disorder with antisocial traits and attributed his adaptive functioning issues to the personality disorder." *Nolen I*, 485

P.3d at 844. Intellectual disability is a functional diagnosis that should be made whenever the three prongs are met. DSM-5 at 39-40; D-59 (AAIDD-2010) at 61; Tr. 2947-48. When an individual's impairments meet the criteria for intellectual disability and also meet the criteria for another mental health diagnosis, the individual should be diagnosed with intellectual disability as well as the second diagnosis. Tr. 2925, 2947-48. *Moore I* considered the lower court's attempt to ascribe the defendant's adaptive deficits to anti-social personality disorder, rather than intellectual disability, and rejected this practice, holding "[t]he existence of a personality disorder or mental health issue, in short, 'is not evidence that a person does not also have intellectual disability.'" 581 U.S. at 17 (quoting *amici curiae* brief). The *Brumfield* Court similarly rejected this practice, holding that the diagnosis of intellectual disability does not contain "an exclusion criteria; therefore, the diagnosis should be made . . . regardless of and in addition to the presence of another disorder." 576 U.S. at 319-20: *see also Lambert v. State*, 126 P.3d 646, 653 (Okla. Ct. Crim. App. 2005) ("An alternative explanation for an agreed condition is not a negation of that condition.").

*Third*, neither Dr. Steffan nor OCCA conducted a domain-by-domain, or skill-area-by-skill-area analysis of Mr. Nolen's functioning when determining if he met prong two. Even assuming that it was appropriate to base a prong-two analysis on an individual's strengths (and it is not), the reviewing court must consider an individual's functioning in all areas of adaptive behavior. *See* Section I(B)(2), *supra*. OCCA in *Nolen I* relied on criticisms of Mr. Nolen's adaptive functioning presentation in the academics and communication areas. 485 P.3d at 843-44. OCCA failed to address the remainder of the

conceptual domain, or Mr. Nolen's functioning in the social and practical domains. In skill areas, OCCA failed to address whether Mr. Nolen had significant deficits in self-direction, social skills, leisure skills, self-care, use of community services, health, and safety. *Id.* OCCA's determination that the jury could appropriately rule out a diagnosis of ID without addressing those other areas where deficits had been found is contrary to *Moore I* and *II*, and also an unreasonable fact finding.

*Fourth*, OCCA ignored that the TABE scores relied on by Dr. Steffan to rule out intellectual disability were evidence of *impairments*, not strengths. Under current diagnostic standards, deficits in functional academics (or any other area of adaptive functioning) are present when an individual is not keeping pace with age-related expectations. *See* DSM-5 at 37 (defining prong two as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of *similar age* and sociocultural background"). Mr. Nolen was 26 years old at the time he took the TABE, had received three years of academic assistance in the Academy, received additional help from his siblings, and was a high school graduate. He should have been functioning at a twelfth grade level. The TABE was a test designed to determine if an individual was able to pass different parts of the GED, and Petitioner's test results indicated that he would not have passed any part of the GED. Tr. 2803. As discussed in Section I(B)(2), *supra*, Mr. Nolen scored at the 6th grade or below on three of the four subscales and the composite score. These impairments lined up with the deficits in academic functioning described by Mr. Nolen's family. *Id.* Because all of these scores are below age-related expectations, they constituted impairments and confirmed that Mr. Nolen did not

reach a high school level of academic functioning despite his many years in school. OCCA's determination that these scores undermined a finding of intellectual disability is contrary to *Moore I* because it violated the diagnostic standards.

Furthermore, the key for deficits in academic functioning is not whether the individual being assessed can achieve a particular level of functioning, but whether supports are required to achieve that level of functioning. DSM-5 at 38 (adaptive deficits present when functioning is "sufficiently impaired that ongoing support is needed in order to perform adequately in one or more life settings at school, at work, at home, or in the community"). Petitioner failed multiple classes in high school and was moved to the Academy where he was placed in smaller classes, with a slower pace of learning, more individualized attention, and more basic materials. *See* Section I(C), *supra*. Petitioner was provided with supports in all areas of his academy functioning and he *still* failed to keep pace with his peers. Accordingly, Dr. Steffan's claim that the "average" reading level in the United States—even if true—coincided with Mr. Nolen's percentile ranks on the TABE is an inapt comparison. The appropriate analysis under diagnostic standards is whether he was meeting age-related expectations *without support*. As the results of the TABE revealed, he received significant supports and still failed to meet age-related expectations.

*Fifth*, an adaptive behavior analysis focuses on the individual's *typical* functioning, rather than the individual's *maximum* functioning. AAIDD-2010 at 47. The analysis is based on what that individual *typically does not do* in his everyday functioning, rather than what he *does* or *can* do. *Id.* Because the TABE measured Nolen's *maximum* functioning,

OCCA's determination that any particular score on this test would rule out a finding of adaptive deficits was contrary to diagnostic standards, and thus, contrary to *Moore I*.

*Sixth*, as noted above, *Moore I* rejected the use of the *Briseno* factors in the adjudication of an *Atkins* claim. 581 U.S. at 17-21. The *Briseno* factors were a list of questions which, if answered by the factfinder in the affirmative, were thought to undermine a finding of intellectual disability. *Id.* One of the *Briseno* factors based an intellectual-disability determination on whether the defendant can "respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject." *Id.* at n.6. By referring to Nolen's ability to write a coherent letter as somehow inconsistent with a diagnosis of ID, Dr. Steffan, and OCCA, employed one of the *Briseno* factors rejected by the Supreme Court in *Moore I*.

*Seventh*, OCCA's reliance on Nolen's letter was also contrary to *Moore I* because it relied on his prison functioning. Because adaptive functioning is defined as functioning in the community, diagnostic standards reject reliance on adaptive functioning in controlled settings such as prison. AAIDD-2012 at 20. For this reason, the Supreme Court has rejected the use of prison functioning to assess adaptive behavior. *Moore I*, 581 U.S. at 16 (rejecting the lower court's use of defendant's functioning in prison and noting that "[c]linicians . . . caution against reliance on adaptive strengths developed 'in a controlled setting' as a prison surely is" (citing DSM-5 at 38 and AAIDD-2012 at 20)).

*Eighth*, the *Nolen I* court's reliance on Dr. Steffan's hypothesis that Petitioner was giving poor effort on his IQ and Vineland testing based on his TABE scores was both contrary to *Moore I* and an unreasonable finding of fact. The diagnostic standards (and

Oklahoma's capital sentencing law) state that a prong-one determination can only be made based on an individually administered and comprehensive test of intelligence such as the WAIS-IV. Tr. 2794, 2824, 3301-02, DSM-5 at 37, AAIDD-2012 at 17; § 701.10b. The TABE is not individually administered, nor is it an IQ test. Tr. 2528-30. Furthermore, a Vineland II—like all formal measures of adaptive behavior—is based on a third-party's report of the individual's functioning and is not tied to effort on the part of the defendant at all. Tr. 2535-36. And, an adaptive behavior analysis, such as the one conducted with the Vineland II, measures an individual's *typical* functioning, not his or her *maximal* functioning, whereas an achievement test such as the TABE measures an individual's *maximal* functioning, not his or her typical functioning. So, while scores on achievement tests can identify the ceiling on a defendant's typical functioning, a high score on an achievement test does not undermine deficits as measured by the Vineland II or any other description of functioning from a third party. Accordingly, *Nolen I*'s determination that the scores on the TABE could undermine the validity of scores on the Vineland II or the WAIS-IV was an unreasonable factual determination because it was contrary to the record. Likewise, it was contrary to *Moore I* as it violated then-current diagnostic standards.

*Ninth*, OCCA's reliance on Dr. Steffan's claim that Paige had a "limited basis of knowledge" to be a Vineland II reporter, 485 P.3d at 843, violated diagnostic standards and was an unreasonable finding of fact. The diagnostic standards state that appropriate respondents for assessments of adaptive behavior "should be very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times. Very often, these respondents are parents,

older siblings, other family members, teachers, employers, and friends." AAIDD-2010 at 47. Paige lived with Mr. Nolen for significant periods of time in elementary school and middle school, attended the same middle school as him when they lived together, lived with him from the time he was in the eighth grade to the time he graduated from Idabel High School, lived with him before he went to prison in 2011, and lived with him again following his incarceration. Tr. 2730-31, 2743, 2753, 2755-56, 2761; Tr. 3624. This period of time more than satisfies the requirements set forth by diagnostic standards.

Furthermore, Dr. Steffan conceded that a Vineland reporter should be someone who "knows the person well, who has known the person well over a long period of time, and who has known the person well in the recent past. A person who has frequent and regular contact with the person." Tr. 3326. Paige's level of contact with Petitioner meets these criteria as well. Although OCCA seemed to attach significance to when Paige lived with Petitioner, there is no requirement—either in the diagnostic manuals or according to Dr. Steffan—that reporters for a formal test of adaptive behavior have lived with the individual being assessed immediately before the time the Vineland is administered. To the contrary—as Dr. Steffan conceded—teachers are a recognized category of people who can respond to a Vineland II. Tr. 3327. Moreover, as noted above, assessments of adaptive behavior must be broad based and encompass many sources other than a formal instrument. AAIDD-2010 at 51; AAIDD-2012 at 18. As summarized above, Petitioner's adaptive behavior presentation encompassed far more that the Paige Nolen's responses on the Vineland-II. *See* Section I(B)(2), *supra*. So, even if the Vineland-II results were rejected, Petitioner would still have established prong two of the diagnosis. Because OCCA's

analysis in *Nolen I* was contrary to the diagnostic standards, it violated *Moore I* and *II*. Because *Nolen I*'s analysis was contradicted by Dr. Steffan's own testimony as to who an appropriate Vineland reporter would be and ignored the other evidence of deficits in the case, it was based on an unreasonable determination of the facts.

*Finally*, OCCA's determination that Paige testified that "while Nolen did not like to read aloud and would sometimes stutter, he seemed to be an 'ok' reader," 485 P.3d at 843 n.18, was an unreasonable finding of fact. Paige testified that his ability to "read out loud" "seemed to be okay, but he had this thing where he stuttered real bad." Tr. 2736. This portion of Paige's testimony only concerned Petitioner's ability to "read out loud" and did not address his ability to comprehend what he was reading rather than just sounding out the words. *Id.* When asked whether he could comprehend what he read, Paige testified that he "definitely had difficulty" with understanding what he was reading, that she would read something with him, and that it would be clear from their discussions afterward that he had no understanding of what they read. Tr. 2737-38. Paige also testified that, even though she was three years younger than Petitioner, she frequently helped him with English homework. Tr. 2734-35. Although this homework seemed simple to her, Petitioner had significant difficulties learning it, required repeated instruction from Paige, and frequently grew frustrated because of his inability to learn the material. *Id.* Because Paige described significant impairments related to Petitioner's reading, OCCA's reliance on and characterization of Paige's testimony is contrary to the record and an unreasonable finding of fact. *See Brumfield*, 576 U.S. at 315-16 (state court fact-finding that fails to consider the full context and meaning of evidence is unreasonable).

### b.    Age of Onset

In upholding the jury's determination that Mr. Nolen was not ID, OCCA relied on the fact that Dr. Steffan noted that scores Petitioner received in elementary school on group-administered achievement tests fell between the 2nd percentile and the 99th percentile, which "showed that Nolen 'was doing variably. He did really well in some areas and poorly in other areas." *Nolen I*, 485 P.3d at 844-45. OCCA further relied on Dr. Steffan's testimony "that other factors could have affected [Nolen's] grades such as transitions from different schools or instability at home," "that the only time he was able to discern that Nolen had academic assistance was during 10th, 11th, and 12th grades," that Nolen never received special education services, and that tests administered by the DOC did not indicate an onset of before the age of 18. *Id.* at 845.

All of these determinations were contrary to *Moore I* and *II*, based on an unreasonable finding of fact, or both. OCCA's reliance on Dr. Steffan's conclusion that Nolen was not in special education is contrary to or an unreasonable application of *Moore I*. One of the *Briseno* factors that was rejected by the Supreme Court in *Moore I* was "[d]id those who knew the person best during the developmental stage--his family, friends, teachers, employers, authorities--think he was mentally retarded at that time, and, if so, act in accordance with that determination?" *Briseno*, 135 S.W.3d at 8. *Moore I* rejected reliance on a defendant's presence in "normal classrooms during his school career," as opposed to special education classes, because that invoked a *Briseno* factor. 581 U.S. at 18. Further, the diagnostic standards make clear that, for deficits in academic functioning to be present, the only required criterion is that "[f]or school-age children and adults, there

are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations." DSM-5 at 34. As set forth above, regardless of whether Nolen was in formal special education classes, he received supports in *all* of those areas and still could not meet age-related expectations. *See* Section I(B)(2), *supra*. By invoking Petitioner's absence from special education as inconsistent with a diagnosis of ID, OCCA relied on a *Briseno* factor, violated diagnostic standards, and issued a ruling that was contrary to *Moore I*.

OCCA's reliance on the group-administered testing given to Mr. Nolen during elementary school was similarly contrary to *Moore I* and based on an unreasonable finding of fact. Dr. Steffan relied on these group tests—the ITBS—to opine on Petitioner's "abilities or intelligence or whatever" prior to age 18, and the TABE administered by the DOC to conclude that the prison testing was contrary to a diagnosis of ID. Tr. 3344. Under current diagnostic standards and by Oklahoma statute, deficits in intellectual functioning can only be ruled-in or ruled-out through an *individually administered* and *comprehensive* test of *intelligence* that was administered by a qualified *psychologist*. *See* Section I(B)(1), *supra*. The ITBS and the TABE are not individually administered, were not administered by psychologists, and did not measure intelligence. *Id.*; Tr. 2528-29, 2877-80, 3042. Furthermore, IQ tests are normed by age. This means that the individual being assessed is compared to other people his age when determining a score. The ITBS is normed by grade. Tr. 3013. Because Petitioner was retained in the first grade, his scores on all of the ITBS testing were inflated. Tr. 2879-80. Dr. Steffan's testimony violated the diagnostic standards regarding prong one and *Nolen I*'s reliance on this testimony violated *Moore I*.

If OCCA relied on Mr. Nolen's performance on the TABE and the ITBS to address whether prong-two deficits were present in the developmental period, it violated *Moore I*. Both *Moore I* and the diagnostic standards make clear that adaptive behavior is assessed based on the presence of *deficits*, not strengths, and that strengths are *assumed* to co-exist with those deficits; an adaptive behavior analysis based on strengths is a diagnostic practice rejected as unconstitutional. *See Moore I*, 581 U.S. at 15-16. Even if the results of the TABE and the ITBS reflected relative strengths, that still would not undermine the remaining evidence of adaptive deficits that Dr. Steffan and OCCA failed to address. OCCA's conclusion that purported strengths on the ITBS and the TABE were inconsistent with a diagnosis of intellectual disability and endorsement of Dr. Steffan's testimony as a valid basis to deny *Atkins* relief was contrary to *Moore I* and the diagnostic standards.

OCCA's analysis is rendered even more significant because Dr. Steffan *conceded* that the ITBS reflected the presence of significant deficits in addition to strengths. *Nolen I*, 485 P.3d at 844-45 (determining that Dr. Steffan testified that Petitioner "did really well in some areas and poorly in other areas"); Tr. 3344. In this way, even within the realm of academic functioning, in violation of *Moore I*, Dr. Steffan relied on Mr. Nolen's purported strengths to rule out a diagnosis of intellectual disability.

Furthermore, both the ITBS and the TABE reflected the presence of deficits in academic functioning, not strengths. As noted above, an adaptive behavior analysis hinges on whether an individual needs support in order to meet age-related expectations. *See* Section I(B)(2), *supra*. The TABE results returned scores that were predominantly in the range of sixth grade or below, which is far below age-related expectations for a 27 year

old. *Id.* And, as noted above, Petitioner's scores on the ITBS were inflated because he failed the first grade. *Id.* Even with this inflation, Nolen's scores on the ITBS declined from the first grade when he took his first ITBS to the fifth grade when he took his last one. *Id.* This is typical of individuals with ID, who are frequently not distinguishable from their age-mates during childhood, but fall further and further behind as they are out-paced by their peers. *See* Section I(B)(2), *supra*. Petitioner's continued decline on the ITBS is consistent with this dynamic and reflects his inability to keep pace with age-related expectations. Because OCCA in *Nolen I* endorsed an analysis that ignored the prong two focus on age-related expectations, its ruling was contrary to diagnostic standards, and thus, contrary to, or an unreasonable application of, *Moore I*. Because OCCA ignored the trajectory and results of Nolen's test scores, it rested its analysis on an unreasonable finding of facts.

OCCA in *Nolen I* also ignored that the developmental period lasted until the age of 18. The pattern of academic failure that was initially documented in the trajectory of Nolen's ITBS results continued into the rest of his school career. When Mr. Nolen entered high school, he received Fs and Ds in his academic classes until he was diverted to the Academy; still struggled at the Academy, an environment that provided extensive supports and involved a more basic curriculum; scored below the 1st percentile on the pre-ACT PLAN test; and failed all three of his EOI tests. *See* Section I(B)(2), *supra*. This was consistent with his academic performance as an adult, where he scored in the bottom 4th percentile on the ACT; was directed towards remedial courses at Carl Albert State College; failed those classes; was placed in a remedial program at Langston University and failed a

number of courses there as well; and ultimately scored in the impaired range on achievement testing administered to him as an adult in math and reading comprehension. *Id.* By ignoring the before-18-age cutoff that existed at the time of Nolen's trial, OCCA's decision was contrary to diagnostic standards, and thus, contrary to, or an unreasonable application of, *Moore I*. By ignoring the significant evidence of academic impairments that post-dated the administrations of the ITBS, but pre-dated Nolen's eighteenth birthday, OCCA based its analysis on an unreasonable determination of the facts.

Moreover, OCCA's reliance on Dr. Steffan's opinion that "other factors could have affected [Petitioner's] grades such as transitions to different school and instability at home" 485 P.3d at 845, was contrary to *Moore I*. ID disability is a functional diagnosis that exists whenever impaired functioning, as defined by prongs one through three, is present. DSM-39-40; AAIDD-2010 at 61. Environmental elements such as childhood instability, dysfunctional parenting, and a poor educational environment are all documented risk factors, i.e., causes of ID. AAIDD-2010 at 60. In *Moore I*, the state court denied Moore's claim based, in part, on the assertion that Moore's dysfunctional childhood undermined a prong two finding. 581 U.S. at 16-17. *Moore I* endorsed the AAIDD's risk factor analysis and rejected the use of environmental risk factors to explain away adaptive deficits, holding that these factors cannot be used "to counter the case for a disability determination." *Id.* By viewing Dr. Steffan's attempt to explain away Mr. Nolen's poor functioning with risk factors for ID as a valid ground upon which the jury could have rejected Nolen's claim of ID, OCCA's ruling was contrary to, or an unreasonable application of, *Moore I*.

Finally, OCCA's deference to the jury's verdict is not valid in light of the flawed instruction on age-of-onset that Nolen received. The jury was instructed that Petitioner only established the age-of-onset requirement if he presented evidence "that the Defendant's onset of the mental retardation was noticeable before the Defendant was eighteen (18) years of age." *See* O.R. 1469. By defining the third prong as whether the deficits were *noticeable* as opposed to *present*, OCCA employed a *Briseno* factor. As set forth above, one of the *Briseno* factors that were rejected in *Moore I* was "[d]id those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities— think he was mentally retarded at that time, and, if so, act in accordance with that determination?" *Briseno*, 135 S.W.3d at 8. Because the jury was instructed to employ a *Briseno* factor, *Nolen I*'s analysis violates *Moore I*.

### 2. The *Nolen I* Court's Analysis Rendered the *Nolen II* Court's Opinion Unreasonable Under § 2254(d).

In addition to raising his *Atkins* claim on direct appeal based on the evidence that was in the record at the time of trial, Mr. Nolen requested *Atkins* relief in post-conviction based on both the pre-existing record and new evidence that had emerged after his death sentence was issued. He argued that he was entitled to post-conviction relief because Dr. Shields's 2020 WAIS-IV confirmed the presence of prong one deficits, new evidence of Nolen's adaptive deficits (even in the controlled setting of a prison) confirmed that prong two has been met, and Mr. Nolen had established prong three with the pre-existing presentation. Att. 1 at 5-7. Citing and relying on the analysis in *Nolen I*, the *Nolen II* court denied post-conviction relief because, based on *Nolen I*'s analysis, the jury's verdict had

already been found to be valid as to prongs two and three; the new prong two evidence did not provide grounds for relief in post-conviction; and Nolen's *Atkins* claim was "barred by the doctrine of *res judicata*." *Id.* at 6-7. Because, as set forth above in Section I(C)(1), *supra*, the *Nolen I* court's conclusions were contrary to, or an unreasonable application of, *Moore I* and *II* and based on unreasonable findings of fact, the *Nolen II* court's findings violated §§ 2254(d)(1) and (d)(2) as well.

3.   **The *Nolen II* Court Based Its Ruling on an Unreasonable Finding of Fact When It Failed to Remand Nolen's Case for an Evidentiary Hearing.**

OCCA's denial of relief in *Nolen II* without an evidentiary hearing was an unreasonable fact finding under § 2254(d)(2). *Brumfield* is directly on point. Brumfield was convicted and sentenced to death in a pre-*Atkins* trial. He alleged in post-conviction proceedings that he was ID and ineligible for the death penalty. *Brumfield*, 576 U.S. at 309. Relying on evidence from the penalty phase of his trial, Brumfield proffered IQ testing and evidence of adaptive functioning, raised an *Atkins* claim, and requested an evidentiary hearing. *Id.* at 309-10. Even though "evidence in the record before the state court may have cut against Brumfield's claim of intellectual disability," because the record before the state court "raise[d] a question as to whether Brumfield met the[] criteria [for ID]," and the state court's reasoning as to why the record precluded a finding of ID was wrong, the Supreme Court held that the state court based its ruling on unreasonable fact findings. *Id.* at 318-21.

Here, Mr. Nolen proffered a new IQ score that confirmed the presence of prong one; neuropsychological testing that confirmed the presence of adaptive deficits in the conceptual domain and is consistent with his reported deficits in the social and practical

42

domains; and behavioral observations establishing that—even in the supportive environment of prison—he suffers from significant deficits in adaptive functioning. Furthermore, as Dr. Steffan conceded, after age 18 an individual's IQ is stable over time absent an intervening event such as a severe head injury. Tr. 3373. Because no such intervening event has occurred in Mr. Nolen's history, the additional IQ and neuropsychological testing also supports the presence of prong three. And, as set forth above, the IQ, neuropsychological testing, and poor adaptive behavior in prison correspond to pre-existing evidence of poor functioning during the developmental period. So, the new evidence, again, confirms the presence of prong three. Mr. Nolen therefore more than "raise[d] a question" as to whether he met the criteria for intellectual disability in his post-conviction application. He proffered evidence that had not been considered by the jury and, if presented, would have established all three prongs of ID.

Just as in *Brumfield*, the state court's determination that this new evidence changed nothing about Mr. Nolen's intellectual-disability claim was unreasonable. The state court held that, because prong one had been established, the new ID-range IQ score was superfluous. *See* Att. 1 at 5. This conclusion ignored the facts that Dr. Steffan sought to discredit the IQ testing conducted at trial and testified that he did not believe the test to be valid; that the state echoed Dr. Steffan's analysis and argued that the IQ testing should be rejected by the jury; and that the jury did not specify upon what grounds it was rejecting Mr. Nolen's *Atkins* claim. *See* O.R. 1543-44 (verdict form); *Nolen I*, 485 P.3d at 838-39. Because Dr. Shields's testing—which was determined to be valid and administered by a psychologist chosen by the DOC—returned a score in the presumptive range of ID, this

new evidence proves that Dr. Russell's IQ score was accurate and prong one is established. While the *Nolen I* and *II* courts correctly found that Dr. Russell's IQ testing satisfied prong one, there is no guarantee that the jury did so too. The fact that the *Nolen I* and *II* courts found prong one to be met renders OCCA's refusal to remand for a new hearing more egregious, not less. The state court cannot, on the one hand, concede that Mr. Nolen meets prong one; while on the other hand, deny an evidentiary hearing when the jury could very well have denied relief based on an erroneous interpretation of his IQ testing. OCCA's denial of an evidentiary hearing in *Nolen II*—where it refused to acknowledge the prosecution's arguments, Dr. Steffan's testimony, and the fact that the jury may have denied relief based on prong one alone—is an unreasonable finding of fact.

*Nolen II*'s ruling was also unreasonable because it ignored *Nolen I*'s analysis of Dr. Steffan's testimony. In his analysis of Mr. Nolen's academic functioning, Dr. Steffan acknowledged that the scores on the group-administered achievement testing that he was relying on for his opinion regarding Mr. Nolen's academic functioning were inconsistent with the Vineland and IQ scores. *See* Section I(C), *supra*. Dr. Steffan attempted to explain these discrepancies by hypothesizing that Mr. Nolen did not give good effort on the WAIS. *Nolen I*, 485 P.3d at 843. That Mr. Nolen received a second score in the range for ID on a separate WAIS-IV given by a separate psychologist who determined that her IQ testing was valid undermines Dr. Steffan's factual claim completely. Att. 18 at 500-02 (Shields Rep.). By ignoring Dr. Steffan's testimony, its own prior analysis in *Nolen I*, and the significance of a second IQ score, OCCA's determination in *Nolen II* that a second IQ score would make no difference was an unreasonable finding of fact.

Furthermore, in addition to the IQ testing, Dr. Shields also conducted neuropsychological testing, which established impairments in processing speed, executive functioning, communication, and academic functioning. *See* Section I(B)(2), *supra*. These brain-based impairments established deficits in the conceptual domain, and corresponded to behavioral evidence of impairments in the conceptual, social, and practical domain. *Id.* Under the skill-area system employed by OCCA, this testing would have established deficits in self-direction, communication, and functional academics, and corresponded to deficits in the other skill areas established at Nolen's trial. OCCA was unreasonable in finding Dr. Shields's assessment did not raise a question of fact bearing on the legality of Mr. Nolen's sentence where, if credited, it would have established prong two.

OCCA's determination that "[e]vidence that Nolen demonstrates present adaptive functioning limitations does not provide grounds for relief on post-conviction," Att. 1 at 6, is also unreasonable. That Petitioner can demonstrate significant adaptive deficits even with all of the supports of a prison setting confirms the presence of adaptive deficits earlier in his life. OCCA's determination that this evidence was irrelevant to an *Atkins* determination absent an evidentiary hearing was an unreasonable finding of fact.

The legal standard set forth under state law only strengthens Petitioner's position. A post-conviction petitioner is entitled to an evidentiary hearing if the issues he presents involve a question of fact bearing on the legality of his sentence. *See* Rule 9.7(D)(5) and (6), *Rules of the OCCA*, 22 O.S. §§ 1089(C)(2) and (D)(2). Here, where the new evidence presents a question of fact bearing on whether Mr. Nolen is ID, this standard had been met.

### 4. *Nolen I* and *II* Violated *Moore I* By Employing Obsolete Criteria to Define Significant Deficits in Adaptive Behavior.

*Moore I* held that *current* diagnostic standards were binding in an *Atkins* proceeding. 581 U.S. at 20. The *Moore I* Court further rejected the use of obsolete diagnostic standards in determining whether someone is entitled to *Atkins* relief. *Id.* Citing the then-current manuals from the AAIDD and APA, *Moore I* held that "[r]eflecting improved understanding over time, . . . current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians." *Id.* (internal quotations omitted). Under the diagnostic standards set forth by the AAIDD and APA at the time of Mr. Nolen's trial, prong two was established when there were significant deficits in at least one of three domains of adaptive functioning: conceptual, social, and practical. *See* Section I(C)(2), *supra*. The Tenth Edition of the AAIDD manual adopted this three-domain system in 2002, and DSM-5 adopted it in 2013. Tr. 2929-30. In Oklahoma, prong two as being meet when a defendant has significant deficits in two of ten skill areas. § 701.10b. This definition originates from the diagnostic manuals that predated the DSM-5 and the AAIDD's 2002 manual and is "25 years out of date." Tr. 2930-31.

Pursuant to § 701.10b, Mr. Nolen's *Atkins* claim was assessed under the eleven-skill-area system rather than the three-domain system. The jury was instructed that the eleven-skill-area definition, and not the three-domain system, governed its decision. Tr. 2504 (instructing that legal definition of adaptive behavior differs from diagnostic definition); Tr. 3285 (overruling defense's objection to use of the eleven-skill-area system in defining prong two); Tr. 3412 (instructing on the skill-area analysis). *Nolen I* reviewed

the adaptive behavior presentation under the eleven-skill-area system, 485 P.3d at 840, and *Nolen II* relied on the prong two analysis set forth in *Nolen I*. Att. 1 at 6-7. While Mr. Nolen submits that he meets prong two under *any* diagnostic system—old or new—the fact that his *Atkins* claim was considered under obsolete standards was contrary to or an unreasonable application of *Moore I* and *II*.

**D.  Mr. Nolen Is Entitled to *Atkins* Relief Based on the Record Presented in State Court.**

Mr. Nolen is entitled to *Atkins* relief based on the evidence presented in state court. He meets all three prongs of the diagnosis. Two separate mental health practitioners—Dr. Russell and Daniel Reschly, Ph.D.—separately diagnosed him as having intellectual disability and testified in support of that diagnosis. Tr. 2497-2544, 2942-51. Because the *Nolen I* and *II* opinions violated § 2254(d), they are not entitled to deference and Mr. Nolen is entitled to relief under *Atkins* and his death sentence should be vacated.

**E.  New Evidence and Current Diagnostic Standards Confirm Petitioner's Diagnosis of Intellectual Disability.[13]**

In addition to the evidence set forth in Sections I(A) through I(D), *supra*, Petitioner is also entitled to *Atkins* relief based on new evidence that was not presented in state court, as well as new diagnostic standards that had not yet been issued when Petitioner's *Atkins* claim was litigated. Petitioner raises this claim based on the evidence and diagnostic standards that were considered in *Nolen I* and *II* as well as new evidence that has not yet

---

[13] This *Atkins* claim and the additional new evidence it relies upon – Dr. Daniel Martell's report and declarations from lay witness (Atts.8-17, 21) – is being presented here for the first time and will be presented to OCCA for exhaustion.

been presented to the state court. As set forth below, Petitioner proffers new evidence and diagnostic standards in support of prongs two and three.[14]

### 1.    New Evidence of Mr. Nolen's Deficits in Adaptive Functioning

#### a.    Conceptual Domain

Mr. Nolen proffers new evidence that he suffered from deficits in academic functioning. As discussed in Claim I(C), *supra*, Nolen had a history of impaired academic functioning early in the developmental period and continued up until the present day. Petitioner proffers additional evidence confirming that he was in "special classes" in middle school that met separately and were known to be "slower classes" than mainstream classes attended by the rest of the school. Att. 11 at ¶ 3 (Golston Dec.). Regardless of whether these were formal special education classes, they constituted an additional support that Mr. Nolen received in school and confirm accounts of the witnesses who testified at his trial. Similarly, Petitioner proffers additional evidence regarding the nature and pace of the learning environment at the Academy. School personnel confirm that the curriculum at the Academy was "limited and less rigorous" than normal classes at the mainstream high school, Att. 17 ¶ 6 (Reesing Dec.), that there were no benchmarks or required levels of achievement at the Academy, *see* Att. 9 ¶ 6 (Andrews Dec.), and that so long as Academy students showed some improvement, they would be issued passing grades, Att. 9 ¶ 6 (Andrews Dec.). Even given this slower curriculum, Karen Andrews, who taught Mr.

---

[14] Prong one is fully addressed in Claim I(B)(1), *supra*.

Nolen at the Academy, remembered Nolen having "trouble understanding" and being "easily frustrated." Att. 9 ¶ 9 (Andrews Dec.).

After graduating from high school, Mr. Nolen tried unsuccessfully to attend college. In addition to the evidence introduced at trial, Carl Albert State College administered Compass placement tests to him to determine if he was ready to take general education classes. *See* Att. 12 ¶ 4-5 (Gross Dec.). He scored well below the threshold for normal classes on his Compass testing, and was placed in remedial courses for Math, English, and Reading—every subject he on which he was tested. *See* Att. 12 ¶ 5-10. Mr. Nolen failed all three remedial courses, a general education computer science course, and dropped out of Carl Albert University. *See* Att. 5 at 1, 3-5 (Carl Albert State College Records).

Petitioner then enrolled at Langston University, a "second chance institution" designed to give students with "low scores and deficiencies the opportunity to enroll and attend." Att. 16 at ¶¶ 4, 6 (Outlaw Dec). Langston had a culture that "believed students could succeed [there] even if they had struggled elsewhere," and provided supports for students who entered the institution with significant academic deficiencies. *Id.* These supports included, for example, assigning students to remedial classes that were "designed to give students who were significantly behind the help they needed to learn." *Id.* at ¶ 5. Mr. Nolen took the ACT two times in June 2005. On both occasions, he received composite scores of 12, which is the bottom 4th percentile. *See* Att. 6 at 23 (Langston University Records); Tr. 2531-32. Langston University also administered him Basic Skills Tests to aid in his placement, which assessed his Math, Reading, and English skills. Att. 16 ¶¶ 9-14 (Outlaw Dec.). Petitioner tested at the remedial level in Math and Reading and was

placed in remedial classes in those subjects. *Id.* While he received a score on his English Basic Skills Test that permitted him to be placed in English Composition I, a general education course, this score was inconsistent with the rest of his testing profile and his educational history. Further, his subsequent performance demonstrated that he did not belong in that class. *Id.* at ¶ 12. He failed English Composition I, was erroneously promoted to English Composition II, and received another F in that course. *Id.* The other courses in which he enrolled were either not academic in nature and taught only basic daily living skills (i.e., Personal and Social Development and Academic Achievement Seminar) or were easy classes that only required the student show up in order to receive an A (i.e., General Psychology, Introduction to Soils, and Introduction to Technology). *Id.* at ¶¶ 14-19. After the Fall 2005 semester, Petitioner dropped out of college for a second time and never returned. *See* Att. 6 at 23-24 (Langston University Records). As a 26-year-old having received intensive supports throughout high school as well as remedial coursework during his brief stints in college, Petitioner was performing academically at or below a sixth-grade level in most subjects. *See* Section I(C), *supra* (discussing TABE subscales scores).

Petitioner also proffers new evidence of his deficits in executive functioning and self-direction. Those that knew him describe Petitioner as having "no smarts," "not a full box of matches," "slow," "behind his peers," and having "the mind of a child" during adulthood. Att. 11 ¶ 3 (Golston Dec.); Att. 14 ¶ 4 (Johnson Dec.); Att. 13 ¶ 3 (Hime Dec.); Att. 10 ¶ (Davis Dec.). Trudie Johnson, a cousin of his with whom he lived after attending Langston University, described his difficulties with following directions and the need for repeated redirection. Household chores required "step-by-step instructions" given multiple

times. Att. 14 ¶ 4 (Johnson Dec.). Ms. Davis, with whom Petitioner also lived as an adult, testified that he struggled to complete tasks and needed careful instructions to complete basic tasks successfully. Att. 10 ¶ 9 (Davis Dec.).

In addition to Mr. Nolen's struggles in school, he also struggled on the football field where he had difficulty learning, problems understanding instructions, and required repeated redirection in order to complete plays. Kenny Golston, a peer and fellow teammate, recalled coaches yelling at Nolen until they figured out that he "couldn't run a play or a scheme like the other players." Att. 11 ¶ 6 (Golston Dec.). Petitioner ended up as a nose guard, a position which required no knowledge of a play but solely required Nolen to run and sack the quarterback. *Id.* As in school, *see* Section I(B)(2), *supra*, if Nolen failed to understand others, he frequently shut down. Att. 14 ¶¶ 4-5 (Johnson Dec.).

Petitioner has also proffered additional evidence of his communication deficits. Consistent with the reports from his sisters Paige and Megan, Mr. Golston reported that Petitioner struggled to express himself and thus did not talk much. Att. 11 ¶ 8 (Golston Dec.). Ms. Johnson stated that he had difficulty understanding others; she often had to say things multiple times to help him understand; and she could not ask him to do multiple things at once. Att. 14 ¶ 4 (Johnson Dec.). Jammie Davis, who testified during trial for the defense, confirmed that he was "slow in finding words" and "would have to think about what he wanted to say" when speaking with others. Att. 10 ¶ 6.

### b. Social Domain

As already discussed in Claim I, Mr. Nolen was teased in school for his slowness and used for his gullibility. Att. 11 ¶ 4 (Golston Dec.) ("Alton was easily tricked. . . . He

didn't realize people were using him . . . ."). Nolen's leisure skills were minimal. He played football during high school, and given his size and strength, he did well, but could not be relied on to run plays. Att. 11 ¶ 6 (Golston Dec.). As mentioned above, the coaches placed Nolen in the nose guard position because it a nose guard's assignment was basic and did not involve remembering plays. *Id.* (Golston Dec.).

### c. Practical Domain

As noted above, Mr. Nolen required repeated instruction and close supervision in order to complete routine errands and household tasks. Att. 14 ¶ 4 (Johnson Dec.); Att. 10 ¶ 9 (Davis Dec.). In addition to the assistance with taxes that Paige testified to, she provided Mr. Nolen with assistance in filling out forms generally. Att. 8 at 34 (Martell Rep.). Moreover, while he could drive, he did not navigate Oklahoma City and had to be picked up and dropped off by his relatives. Att. 14 ¶ 8 (Johnson Dec.); Att. 10 ¶ (Davis Dec.). Ms. Davis reported that Petitioner had difficulty running errands for others, and never cooked or prepared food for himself when she lived with him. Att. 10 ¶ (Davis Dec.).

The same reasons that inhibited Mr. Nolen from living independently also made him unable to keep a steady job before his job at Vaughan Foods. Att. 8. at 35 (Martell Rep.). He could not follow instructions while employed, could not "keep up" at work, and had difficulty successfully managing social interactions with his supervisors. *Id.* He was either doing odd jobs for family such as moving things or yard work, or unskilled jobs that he was unable to keep. *See* Att. 14 at ¶ 9 (Johnson Dec.).

### 2.     New Diagnostic Standards

The new diagnostic standards include a change in the age-of-onset criterion. At the time of Petitioner's post-conviction proceedings, the AAIDD still defined the developmental period operationally as prior to age 18. AAIDD-2010 at 5. The DSM-5, which was then the APA's most recent diagnostic manual, did not specify a particular age and required only that the age-of-onset be in the developmental period. DSM-5 at 33. In 2021, AAIDD-2021 was issued. Reflecting advances in the field of intellectual disability, AAIDD-2021 defined the developmental period as prior to age 22. AAIDD-2021 at 32-33.

While Mr. Nolen meets prong three under either the new or the old age-of-onset requirement because his deficits were present long before the ages of 22 and 18, *see* Section I(D), *supra*, the change in the age-of-onset requirement renders the analysis put forward by *Nolen I*, *Nolen II*, and Dr. Steffan obsolete. *Moore I* made *current* diagnostic standards binding on *Atkins* claims and rejected any attempt to employ outdated standards used in the past. *Moore I*, 581 U.S. at 20. Because the prong-three analysis employed by Dr. Steffan and OCCA in *Nolen I* and *II* employed an out-of-date definition of prong three, this analysis, and the *Nolen I* and *II* opinions, are no longer valid under *Moore I*.

AAIDD-2021 also confirms that adaptive deficits are present when an individual is not meeting age-related expectations. AAIDD-2021 at 29, 42 (defining the frame of reference for adaptive behavior as what is typical for the individual's age peers). Because, as discussed in Section I(C), *supra*, *Nolen I* and *II* endorsed an adaptive behavior analysis that disregarded whether Petitioner was meeting age-related expectations, AAIDD-2021 confirms that *Nolen I* and *II* are contrary to current diagnostic standards and *Moore I*.

### 3.     Petitioner Is ID Under Current Diagnostic Standards.

At the request of counsel for Petitioner, neuropsychologist Daniel A. Martell, Ph.D., conducted what is now the most recent and comprehensive analysis of Petitioner's functioning. He has found that Petitioner meets all three diagnostic criteria as set forth by current diagnostic standards and is a person with intellectual disability.

Under current standards, scores of 75 and below satisfy prong one. Petitioner's IQ scores of 69 and 65 are well below 75, within the presumptive range for intellectual disability, and satisfy prong one. Att. 8 at 7-9 (Martell Report).

After considering the new evidence in conjunction with the evidence that was presented at trial, Dr. Martell also found that Petitioner has significant deficits in all three domains of adaptive functioning under the current standards set forth by the AAIDD and APA. The DSM-5-TR tracks the DSM-5's guidance as to the level of functioning that constitutes significant deficits in adaptive functioning in each of the domains for individuals at each level of intellectual disability: mild, moderate, severe, and profound. DSM-5-TR at 39-41. Consistent with the DSM-5-TR's requirement that deficits in adaptive functioning need only be established in one of three domains for prong two to be met, an individual need only fit into a level of functioning for a single domain in order to satisfy prong two. Dr. Martell has concluded that Petitioner meets the descriptions of functioning for *all three* domains. *See* Att. 8 at 10-37 (Martell Rep.)

Finally, current standards set the age-of-onset criteria as prior to age 22. Dr. Martell concluded that Petitioner's deficits were present prior to both age 18 and 22. *Id.* at 37-38.

**F.     Petitioner's New Evidence Should Be Considered By this Court.**

Neither the new evidence of ID set forth above nor the updated diagnostic standards was considered by the *Nolen I* and *Nolen II* courts. Petitioner will seek to exhaust his state court remedies as to this new evidence in OCCA shortly after filing this petition. Accordingly, the procedural issues need not be addressed until exhaustion has been achieved.

If the new evidence and diagnostic standards are not reviewed in state court, this Court should still consider Petitioner's full claim for relief under *Atkins*, including the unexhausted materials, because executing Petitioner would be a miscarriage of justice. As the Tenth Circuit has explained, the miscarriage of justice exception to the rules of procedural default "applied to those who are actually innocent of the crime of conviction and those 'actually innocent' of the death penalty (that is, not eligible for the death penalty under applicable law)." *Black v. Workman*, 682 F.3d 880, 915 (10th Cir. 2012) (citing *Schlup v. Delo*, 513 U.S. 298 (1995), *Murray v. Carrier*, 477 U.S. 478 (1986), and *Sawyer v. Whitley*, 505 U.S. 333 (1992)); *Myers v. Workman*, No. 07-CV-00131-JHP-TLW, 2011 WL 4606699, at *15 (N.D. Okla. Sept. 30, 2011) (acknowledging a fundamental miscarriage of justice occurs if a court finds constitutional error in a jury's conclusion that a defendant is not ID). In order to overcome a procedural default based on actual innocence of the death penalty, a petitioner must show "by clear and convincing evidence that but for constitutional error . . . no reasonable juror would have found him eligible for the death penalty." *Sawyer*, 505 U.S. at 350. This exception recognizes that any principles of comity or finality protecting the state court judgments "must yield to the imperative of correcting"

a fundamentally unjust sentence of death imposed on an individual ineligible for such penalty. *House v. Bell*, 547 U.S. 518, 536 (2006) (citation omitted).

As shown above, Mr. Nolen can establish by clear and convincing evidence that he is intellectually disabled and thus constitutionally ineligible for the death penalty. He has proffered evidence that he satisfies all three prongs of the diagnosis of intellectual disability and his claim has never been adjudicated under *current* diagnostic standards. Accordingly, he overcomes any procedural default with respect to this claim.

Additionally, barring consideration of new evidence and consideration of Petitioner's *Atkins* claim under current diagnostic standards would violate *Atkins* and its progeny. *Atkins* held that "the Constitution 'places a substantive restriction on the State's power to *take the life*' of a mentally retarded offender." 536 U.S. at 321 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)) (emphasis added). In *Moore I*, the Supreme Court reaffirmed its position that "the Constitution 'restrict[s] . . . the State's power to take the life of *any* intellectually disabled individual." *Moore I*, 581 U.S. at 12 (quoting *Atkins*, 536 U.S. at 321(emphasis in original)). Like *Ford*, which bars the execution of individuals who are not competent to be executed, and *Roper v. Simmons*, 543 U.S. 551 (2005), which bars the execution of individuals who committed their crimes as juveniles, *Atkins* serves as a categorical exemption on the execution of sentence for a class of people. *Roper*, 543 U.S. at 559 (noting that *Atkins* bars "the *execution* of a mentally retarded person") (emphasis added). For the reasons set forth above, Petitioner is intellectually disabled.

Furthermore, *Moore I* requires that *Atkins* claims be assessed under current diagnostic standards and prohibits a procedural scheme that would "'creat[e] an

unacceptable risk that persons with intellectual disability will be executed.'" *Moore I*, 581 U.S. at 6 (quoting *Hall*, 572 U.S. at 704) (modification in original). Prohibiting consideration of Petitioner's *Atkins* claim under the DSM-5-TR and AAIDD-2021 based on a procedural bar would violate *Moore I*'s requirement that claims of intellectual disability be considered under current diagnostic standards. By prohibiting further factual development, such a rule would create a procedural scheme that creates an "unacceptable risk" that an intellectually disabled person—Petitioner—will be executed.

## II.     MR. NOLEN WAS INCOMPETENT TO STAND TRIAL.[15]

After competency proceedings that spanned years, the district court stated, "Mr. Nolen is probably the most evaluated [or examined] human being . . . that I've ever come across in my judicial career." 4/6/17 Tr. 195. This is not surprising given Mr. Nolen was incompetent to stand trial; Mr. Nolen did not respond to (or even acknowledge) questions from the court or counsel for more than a year before trial despite countless opportunities, and every day of his five-week trial he sat in his jail-issued clothes against a wall separate from defense counsel with his fingers in his ears. Nevertheless, the district court found him competent despite a preponderance of evidence showing he was unable to consult with counsel with a reasonable degree of rational understanding.

---

[15] Mr. Nolen raised this claim on pages 16-28 of his direct appeal brief, and on pages 11-26 of his application for postconviction relief.

## A.    Legal Standard

"[T]he criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). To be competent, a defendant must have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and have] a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Oklahoma has codified these constitutional requirements. *See* Okla. Stat. tit. 22, § 1175.1 *et seq*. To prevail on a substantive due process competency claim, a petitioner must prove incompetency by a preponderance of the evidence. *Cooper*, 517 U.S. at 368-69.  To make this assessment, the court reviews "evidence of defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 180 (1975); *see also Pate v. Robinson*, 383 U.S. 375, 386 (1966) (recognizing defendant's "demeanor at trial might be relevant to the ultimate decision as to his sanity"). Importantly, "post-conviction evidence can often be relevant to establishing substantive incompetency." *Grant v. Royal*, 886 F.3d 874, 893 (10th Cir. 2018) (internal citation omitted).

## B.    Petitioner Was Unable to Consult with Counsel with a Reasonable Degree of Rational Understanding and Did Not Have a Rational Understanding of the Proceedings Against Him.

The evidence presented during Mr. Nolen's two competency trials and related hearings regarding his intellectual disability and mental illness, Mr. Nolen's demeanor at trial, and the additional post-conviction evidence presented to OCCA of Mr. Nolen's DOC-issued diagnosis of schizophrenia, forced medication, and ongoing delusions, paranoia, and

psychosis, demonstrate by clear and convincing evidence that Mr. Nolen was tried and convicted while, in fact, incompetent.

### 1. Pre-Trial Proceedings

In March 2015, counsel filed an application for determination of competency based on conversations counsel and the defense team had had with Mr. Nolen. O.R. 34. The court ordered a determination of competency, requiring a doctor from the Oklahoma Department of Mental Health, Dr. Shawn Roberson, to examine Mr. Nolen and make the determinations required by Okla. Stat. tit. 22, § 1175.5(3)(E). O.R. 36-38. This first competency hearing was held October 26-27, 2015. Mr. Nolen presented evidence of his intellectual disability. *See* § 1175.3(E)(3) (including ID as basis for incompetency); Okla. Stat. tit. 10, § 1408(A).

Dr. Russell testified for the defense; Dr. Roberson testified for the State. Dr. Russell interviewed Nolen twice, for a total of seven hours. 10/26/15 Tr. 12. As discussed in Claim I, she administered the WAIS-IV, as well as the Fitness Interview Test Revised (FIT-R) and the Evaluation of Competency to Stand Trial Revised (ECST-R). *Id.* at 13. She also interviewed Paige Nolen to complete the Vineland II and reviewed the competency evaluation of Dr. Roberson as well as relevant records. *Id.* at 14. The FIT-R, a standardized test to evaluate competency, showed Mr. Nolen was aware of the charges against him, but he was confused about the roles of the officers of the court and distrusted his attorneys. *Id.* at 15-16. He believed the district attorney decided the penalty rather than the judge or jury. *Id.* Mr. Nolen wanted to be sentenced to death and was unwilling to consider or participate in any kind of defense. *Id.* Similarly, on the ECST-R, Mr. Nolen was adamant he be given the death penalty but could not "articulate why he wants death." *Id.* Dr. Russell found that

Mr. Nolen was not feigning any mental illness based upon his performance on a section of the ECST-R that screened for feigning. *Id.* at 17. Mr. Nolen believed *he* was the one who made decisions actually made by the judge – that he had more control in the courtroom than he did in fact have – and repeated his refusal to work with his attorney on securing anything other than a death sentence. *Id.* at 17-18.

As she did during the *Atkins* hearing described in Claim I, Dr. Russell discussed the administration of the WASI-II and WAIS-IV to determine Mr. Nolen's overall IQ score of 69. *Id.* at 20-23. She also testified regarding the Vineland-II and the resulting low scores in communication, daily living, and social skills. *Id.* at 29-33. Dr. Russell testified that Mr. Nolen's academic challenges – repeating first grade, ongoing struggles with understanding schoolwork, years in the alternative school – were before he was 18. *Id.* at 33-37, 137-38.

In answering the questions required by the court's order, Dr. Russell determined: Mr. Nolen was able to appreciate the charges against him but was unable to consult with counsel and assist with his defense, "lack[ing] the capacity to plan his legal strategies and work with a lawyer in doing that," in part because of his communication and higher-level reasoning limitations. *Id.* at 38. She also determined Mr. Nolen was incompetent because of major deficits in his intellectual and adaptive functioning. *Id.* at 42.

Dr. Roberson, the State's expert, interviewed Mr. Nolen for one hour prior to the first hearing. 10/27/15 Tr. 271-72. Dr. Roberson testified that competency had not been an issue in Mr. Nolen's prior convictions, and that he was not on any medication or receiving any treatment. *Id.* at 228-29. In answering the court's questions, Dr. Roberson found Mr. Nolen able to appreciate the charges against him. *Id.* at 231-32. He opined that Mr. Nolen

was able, but unwilling, to consult with his attorney and rationally assist in the preparation of the defense. *Id.* at 233. He concluded that Mr. Nolen's decision-making was not delusional or based on mental impairment "no matter how idiosyncratic." *Id.* at 243-44. Dr. Roberson also based his opinion on Mr. Nolen's ability to "compose his behavior in court," his awareness of "how he was expected to act," and his having acted appropriately during his one-hour interview. *Id.* at 244. He testified that "there was absolutely no data to suggest that Mr. Nolen had mental retardation." *Id.* at 246. Dr. Roberson questioned the accuracy of Dr. Russell's scoring of the IQ test she administered, opining that Mr. Nolen's low scores were products of answers based in his ideology rather than answers Dr. Russell would have considered more appropriate. *Id.* at 254. He questioned the validity of Dr. Russell's conclusions regarding Mr. Nolen's adaptive functioning because Paige Nolen, and Mr. Nolen's other sister Megan, gave varying accounts of Mr. Nolen's ability to clean and be goal oriented. He pointed to Mr. Nolen's outperforming some of his peers in early elementary and earning an A in a college course as facts inconsistent with Dr. Russell's finding on intellectual functioning. *Id.* at 216-62.

The following day, the court found Mr. Nolen competent to stand trial. O.R. 104-06. The court concluded that the defense had shown by a preponderance of the evidence that Mr. Nolen had an IQ score of 70 or below and that evidence of sub-average intellectual functioning occurred before the age of 18. *Id.* It, however, found that based on "evidence indicat[ing] that [Mr. Nolen] was able to graduate from high school, play interscholastic sports, gain admission to and attend college, socialize and communicate effectively, work, make efforts to seek higher employment, undertake religious studies, plan and execute

goals and live independently," the defense had not shown that he had "*any* of the requisite cognitive/adaptive skill deficits." *Id.* It further found that Mr. Nolen's interactions with Dr. Russell showed that "he understands his charges, the potential penalties and his defense and that he can communicate with counsel." O.R. 105-06.

After finding him competent, the court arraigned Mr. Nolen on February 11, 2016. Introducing Mr. Nolen to the court reporter, the court explained that "[s]he's got to make a record for us" and will need verbal responses. 2/11/16 Tr. 3. The court then asked, "So can you help me out when we make that record?" *Id.* Mr. Nolen responded, "I don't know anything. I don't want to get on the stand." *Id.* at 3-4. Counsel explained to him that he would not have to get on the stand but would have to answer some questions. *Id.* at 4. The court began asking him questions, and he would answer, "Alhmadulillah," which he later stated means, "[p]raise be to Allah in English." *Id.* at 4-5. When asked if he was going to respond to questions with anything other than "praise be to Allah," Mr. Nolen replied:

> No, I mean, I'll reply to you when you ask me a question; but if it's something that I don't want to speak on, I will not speak. I told [counsel] when he came and spoke to me that I have nothing to say to you. I'm here to, you know – [counsel] told me today was to make my plea, and that's what I'm here for.
>
> Now, if it's anything about dealing with any – the case, the incident that I'm here for, I mean – Allah, you know what I'm saying? You ask me, and I'll reply. If I don't reply, I just don't have anything to say to what you're asking me about.

*Id.* at 5-6. When the court asked him if he knew what his charges were, he responded, "Alhmadulillah." *Id.* at 6. He then continued to answer questions with "yes" or "no" followed by "Alhmadulillah." Counsel renewed his concern related to competency in part

"based on [Mr. Nolen's] appearance today, that's a viable concern," *id.* at 15-16, and

argued he was not competent to enter a plea, *id.* at 19. Mr. Nolen disagreed:

> So I'm, as a Muslim, here standing in you guys' courthouse today, I'm
> conscious of pleading – being able to plead guilty or not guilty. What he just
> said, I totally disagree with. I'm here to make my plea as guilty, that's what
> I'm here for, and I'm conscious.

*Id.* at 19-20. However, the court entered a plea of not guilty for Mr. Nolen, informing him

that if at a later hearing it was satisfied that his plea was voluntarily and knowingly entered,

it would be accepted. *Id.* at 24. Mr. Nolen then launched into a stream-of-consciousness

statement about Muslims and the death penalty, and said he was there to plead guilty to the

death penalty "that you guys offered to me when I first came in." *Id.* at 26-28.[16]

The proceedings reconvened on May 20, 2016. Counsel renewed his objection that

Mr. Nolen was not competent due to mental illness. 5/20/16 Tr. 3-4. Mr. Nolen said he still

wanted to plead guilty but refused to take the stand when asked. *Id.* at 6-7. He complained

that he was "being captive to a bunch of disbelieves people – or disbelievers of Allah, the

one and only God, Allah, most Muslims call him." *Id.* at 7-8. He called the courthouse evil,

the people who work there "slaves to the devil, slaves to sin, slaves to fear," and repeated

his insistence that he wanted to plead guilty. *Id.* at 8. When the court explained that to make

a plea, he would need to get on the stand and testify, he said, "I exclude myself from that.

As a Muslim, I exclude myself from getting on the stand and making – making any type of

---

[16] Mr. Nolen believed the Bill of Particulars was an "offer" of death that he could accept
or reject. 8/12/16 Tr. 125.

testimony." *Id.* He agreed to answer the court's questions from where he was. *Id.* at 8-10.

Asked why the State was seeking the death penalty, he responded:

> The death penalty? Well, as a Muslim, I believe that the Creator of the heavens, the earth, and everything between it and underneath it had this written out before the creation of the heavens and the earth.
> So the only question to me is – what was your question again? I got sidetracked.

*Id.* at 15. Asked if his attorney had advised him not to plead guilty, Mr. Nolen responded:

> No, not at all. Not at all. I'm – to the people in this courthouse, I want to say that you're trying to make like this is a good guy. I don't know this dude. I don't know this dude. Like I said, I don't know what is supposed to happen before he come. He could be a pervert for all I know, someone who like to look at people naked. I don't know that. Which is – which is a sin, which we will – we will all hear on the day of judgment.
> So I'm not standing to honor this person; but, yes, this person did come and asked me do I feel – asked me if that's what I wanted to do. And I told him, Yes, that is what I wanted to do, Yes.

*Id.* at 34. Asked if he felt pressured or coerced in anyway, Mr. Nolen responded:

> Pressure by – pressured by slaved that dealt – yes, I am pressured by their unreligious acts – or religious acts, which again, I call them heathens.
> But being pressured, I feel I'm being pressured by some heathens that is not religious, who lie, who steal things, and say that it's good, who boast about evil; so. . . .

*Id.* at 63. But he stated that those heathens were not making him plead guilty. *Id.* at 63-64.

Not surprisingly, the court reserved acceptance of the plea to "entertain further evidence to Mr. Nolen's ability to knowingly and voluntarily enter the plea." *Id.* at 79.

A dispositional hearing was held on August 12, 2016. The defense called Robert Hunt, an expert on Islam, and Dr. McGarrahan, a psychologist. Mr. Hunt testified that Mr. Nolen's beliefs regarding Islam were not coherent or rational. 8/12/16 Tr. 47. Dr.

McGarrahan evaluated Mr. Nolen to see if he understood the nature and consequences of a guilty plea. She met with him for nine hours over two days on May 5 and 6, 2016, during which she did a battery of neuropsychological testing. *Id.* at 65. She found he was giving good effort with the exception of his performance on memory tests. *Id.* at 183-86. She reviewed information about the charges, academic records, reports from Dr. Russell and Dr. Roberson, and transcripts from the prior competency proceedings. *Id.* at 65 And she interviewed several family members and counsel about their interactions with Mr. Nolen. Based upon her review and evaluation, she found that Mr. Nolen suffered from "severe mental illness characterized by a thought disorder," and "by grandiose and paranoid ideation," causing him to be delusional and out of touch with reality. *Id.* at 109. She concluded that he suffered from unspecified schizophrenia spectrum and other psychotic disorders that prevented him from having a rational understanding of the proceedings and being able to rationally comprehend and appreciate the consequences of his decision to waive his rights. *Id.* at 115-16.

Dr. Roberson testified again for the State. He met with Mr. Nolen for an additional hour and fifteen minutes, following an hour-long meeting more than a year earlier. 8/12/16 Tr. 217. He disputed the relevance of the battery Dr. McGarrahan had administered, relying instead on a self-reported measure of psychopathology he administered to Mr. Nolen, where Mr. Nolen denied having any significant psychological problems. *Id.* at 209-10. He also questioned the correctness of Dr. McGarrahan's conclusion that Mr. Nolen was not malingering, ultimately concluding he was just not cooperating. *Id.* at 207. Dr. Roberson testified that his conclusions were corroborated by his observations while with Mr. Nolen:

that Mr. Nolen was not symptomatic, that he demonstrated nothing indicative of a thought disorder, and that Mr. Nolen was able to engage in a coherent conversation. *Id.* at 216-17. Dr. Roberson found Mr. Nolen was not unable to understand or participate but was unwilling. *Id.* at 262. The court then asked Dr. Roberson what his opinion on competency would be if he were to hypothetically assume Dr. McGarrahan was correct. He said unequivocally, "he would be incompetent." *Id.*

At the close of the hearing, the court acknowledged that it continued to "struggle" with the evidence, that competency is a "fluid issue," that "the proceedings have been consistently muddied with a competency question," that the court still had "doubt." 8/17/16 Tr. 3-4. At one point the court noted it had given Mr. Nolen's competency issue "a great deal of prayer, because, at some point I thought maybe I needed a little divine intervention with the decision." *Id.* at 3. Yet, it was the "victim's rights" that led to the court's conclusion to decline to accept Mr. Nolen's plea without another competency hearing:

> I hope that I'm accused of protecting the victim's rights as much as I am of the defendant's. They weigh heavily on me. *And I think I came to my conclusion driving back from Missouri yesterday on how I was going to rule thinking simply about them.*
>
> I am not confident that if I decide to go forward and accept this plea, that it will withstand appellate scrutiny. And if I'm wrong and it gets sent back, they have to relive it over and over and over, and I will not do that to this family – these families. I won't do it to them.
>
> To have the State prove the aggravators this week, to have that family testify, to have those victims give those heartfelt unbelievable stories that are contained in the preliminary hearing, and even more, when I'm sentencing, and then to have them do it again if I'm wrong is more than I can – I can countenance.
>
> I am going to protect Mr. Nolen's rights with everything that I've got; but I'm going to protect their rights, too. They are entitled to justice. And while it may not be swift, I'm going to guarantee it's sure.

> So it is the judgment and sentence of this Court that I decline to accept the defendant's plea at this time.

*Id.* at 6-7 (emphasis added). To be clear, the court based its competency decision on the victims' rights.

On November 2, 2016, because of Mr. Nolen's refusal to cooperate in any further evaluation, the court ordered he be transferred to the OFC for observation. *See* 11/2/16 Tr. 3-4; O.R. 362-64. Mr. Nolen's second competency hearing was held April 3 to 6, 2017. On the first day, trial counsel informed the court that while Mr. Nolen appeared in court that day, he had refused numerous efforts by counsel to visit since the last hearing. 4/3/17 Tr. 6. During the testimony of the first witness on the first day, Mr. Nolen wanted to get up, a deputy requested he sit, and he refused to do so. An altercation then ensued with Mr. Nolen being taken to the ground and held down. The court then questioned him on his desire to be present at the proceedings. Mr. Nolen looked down the entire time the court was questioning him and refused to answer any of the court's questions. He was excused from the remainder of that day's proceedings. *Id.* at 30-33. The following day he refused to go to the jail's video arraignment room and refused to see counsel and an investigator who had attempted to visit him that morning. 4/4/17 Tr. 4. He similarly refused to respond via video when asked whether he wanted to attend the third or fourth day of the competency

hearing, or the following day when a pre-trial *Atkins* hearing was held. 4/5/17 Tr. 5-9; 4/6/17 Tr. 4-10; 4/7/17 Tr. 5-8.[17]

At the competency proceeding, the defense presented several witnesses who worked at OFC and the Cleveland County jail and observed Mr. Nolen. A psychiatric intern, Brooke Harboe, testified regarding his intake screening at OFC, 4/3/17 Tr. 116-17, which she conducted, noting that Mr. Nolen was disorganized in his thought process, which she described as "[c]ognitive disorganization marked by some circumstantial responses," *id.* at 127-28. Dr. Moira Redcorn, a psychiatrist at OFC, testified that Mr. Nolen presented symptoms of depression; symptoms of mania, including distractibility, grandiose thoughts, flight of ideas, and talkativeness; religious preoccupation; and a paranoid thought process. 4/5/17 Tr. 33-34, 39-40. She believed the most prominent symptom of mental illness displayed by Mr. Nolen was disorganized speech. *Id.* at 40. Her initial diagnosis of Mr. Nolen was to rule out psychosis and Post-Traumatic Stress Disorder. *Id.* at 119; *see id.* at 159-60. When asked if it were possible that mental illness manifests itself for the first time at the age of 32, Dr. Redcorn noted while "not typical," she had seen it. *Id.* at 121.

Dr. McGarrahan testified again for the defense.[18] While she had attempted to evaluate Mr. Nolen again, he refused. *Id.* at 150. Thus, she relied on her past evaluation

---

[17] At a hearing on April 11, 2017, following the court's finding of competency, Mr. Nolen was physically forced into the courtroom and refused to answer any of the court's questions regarding whether he wished to proceed with his guilty plea. *See* 4/11/17 Tr. 3-6.

[18] The court "adopt[ed] the evidence adduced at the prior competency and the prior plea hearings and the known and voluntary hearings that we had subsequent to the plea hearing." 4/5/17 Tr. 144.

and additional records, including his jail records and OFC records, which documented symptoms consistent with her initial evaluation. *Id.* at 162, 165-69. She testified that Mr. Nolen presented symptoms of distractibility, flight of ideas, disorganized thoughts, paranoia, grandiosity, verbal and physical aggression, and hostility, *id.* at 181-82; and that "the constellation of the signs and symptoms . . . was indicative of severe mental illness." *Id.* at 154. She opined that he suffers from a psychotic disorder, most likely schizophrenia, *id.* at 180, and ruled out malingering, particularly given his express desire to not be found mentally ill, *id.* at 181-82. She determined that he was not able to appreciate the charges, the consequences, the court proceedings, and what rights he was waiving; that he did not understand the defenses available; that he could not consult with his attorney or rationally assist in the preparation of a defense, as his paranoia, hostility, and aggression prevented him from engaging rationally with anyone, *id.* at 185-86; that "his decision-making abilities are so impaired that [his choice to engage in certain behavior is] coming from mental illness and not from rational thought," *id.* at 176; that he required treatment; that if treated, he could maintain competency, *id.* at 187. She concluded that he suffered from severe mental illness that renders him incompetent. *Id.* at 189.

Dr. Roberson then testified. His previous testimony and reports were incorporated. 4/6/17 Tr. 13. He did not see "signs of mental illness or cognitive impairment" in Mr. Nolen. *Id.* at 18. He again criticized Dr. McGarrahan's reliance on neuropsychological testing and its validity. *Id.* at 19-21, 29-30. He relied on the absence of prior mental illness diagnoses in Mr. Nolen's history as further evidence that his behavior was not a sign of

mental illness but "unresponsiveness, uncooperativeness." *Id.* at 30-31.[19] He found Mr. Nolen competent. *Id.* at 31.

Dr. Orth, who observed Mr. Nolen during his admission to OFC, testified next. At their first encounter, Mr. Nolen did not open his eyes and said that he had already answered the questions and had nothing to say. *Id.* at 56. Mr. Nolen did mention religion and that he was not trying to be rude; Dr. Orth believed his decision not to answer questions he believed he had already answered was a rational decision. *Id.* at 57-58. Dr. Orth did not observe signs of paranoia or suspiciousness or concentration or focus impairments, *id.* at 81-82, and testified that Mr. Nolen did not display disorganized or delusional thinking despite his religious fixation, which was more of an overvalued idea, *id.* at 104-05. Dr. Orth found Mr. Nolen competent and believed any difficulty Mr. Nolen was experiencing was the result of the way he chose to behave. *Id.* at 91. In describing his assessment of Mr. Nolen's understanding of the proceedings, Dr. Orth said simply: "All he's got to be able to do is say, I'm going to go to court, here's the pleas I can enter." *Id.* at 150. Dr. Orth conceded that the absence of competency concerns in Mr. Nolen's previous cases was not indicative as to whether he has mental illness. *Id.* at 141.

---

[19] Dr. Roberson no longer relied on Mr. Nolen's ability to "compose his behavior in court" or his awareness of "how he was expected to act," in determining competency. *See supra.*

Acknowledging Mr. Nolen's behavior as bizarre and unconventional, the court nonetheless found him competent, finding that the defense had not met its burden and characterizing competency as "capable of self-determination." *Id.* at 194-95.[20]

## 2. The Jury Trial

During a pre-trial conference the day before voir dire, Mr. Nolen held his fingers over his ears and refused to answer any questions or otherwise participate. 9/6/17 Tr. 3, 6-8. The court ruled that Mr. Nolen would be present unless he affirmatively waived his presence on the record in open court, *id.* at 11, which he did not. On the first day of voir dire, Mr. Nolen refused to wear civilian clothes; he appeared in court in jail clothes. Tr. Panel A 3-4. Mr. Nolen did not sit at counsel table or communicate with his attorneys; he sat against a wall with his fingers in his ears. Sometimes his arms were in his shirt with his hands coming up through the neck opening. He remained like this for the nearly-five-week trial. *See* Tr. 469, 718, 1228, 1346, 2050-51, 3147-48, 3488, 3780. At his formal sentencing two months later, Mr. Nolen was "in the same position as he was during the course of the five weeks of the trial, which is against the wall, fingers in the ear." 12/15/17 Tr. 3.

## 3. Post-Conviction Evidence of Incompetency

Mr. Nolen's mental health and behavioral concerns remain. *See* Att. 18 at 146 (noting "progressive decompensation of [Mr. Nolen's] mental health"). Mental health

---

[20] The court then compared Mr. Nolen to Dylann Roof, "the Colorado shooter," and Westboro Baptist Church, in dismissing Mr. Nolen's unconventional beliefs – "I think they would think the same thing of Dylann Roff [sic], of the Colorado shooter, Westboro Baptist Church, it doesn't confirm. They're not capable of self-determination." 4/6/17 Tr. 196.

progress notes repeatedly refer to Mr. Nolen being "paranoid," "delusional," and a "concrete thinker [with] poor reasoning skills." *See, e.g.*, Att. 18 at 43, 63, 70, 83; *see also id.* at 117 (noting Mr. Nolen "unable to focus on the conversation, appeared to be distracted by religious delusions and internal stimuli . . ., evidence of delusions, paranoia, and psychosis"); *id.* at 161 (noting doctor "to evaluate for schizophrenia"). A progress note from February 22, 2019, notes Mr. Nolen "is decompensating," "he is not caring for himself," his "thoughts are illogical and he is stuck in a fixed delusional pattern." Att. 18 at 29. A May 23, 2019 Mental Health Review notes:

> Since arriving in December of 2017 Inmate has failed to adapt to his environment. He does not engage in basic daily living skills. Inmate continues to refuse shower or clean/cut his hair. Inmate smells very badly. He keeps trash items in his cell and the runman has to clean his cell periodically because Inmate refuses to do so. He is continuing to not engage in a meaningful way with staff, occasionally becoming verbally aggressive. He keeps his face and head covered more often than not with his blanket. He refuses to turn in his clothing to be laundered. Inmate utilizes his conceptualization of his religious ideas as a way to avoid listening to ideas or directives that he does not agree with, calling them "foolish". This greatly affects inmate's ability to engage in effective communication with staff that is necessary to facilitate meaningful exchanges with his unit team. . . . The mental health team at this facility has spent extensive amounts of time trying to help Inmate adapt and learn processes at this facility; however, Inmate refuses to help himself. The team has referred Inmate to psychiatry for medication consultations many times but Inmate refuses to take medications as advised. Inmate has been placed on therapeutic seclusion which momentarily improved his hygiene but he deteriorated back to poor hygiene once placed back on the unit.

Att. 18 at 11. On December 5, 2019, DOC Behavioral Health Clinician Tina Fuller referred Mr. Nolen to Joseph Harp Correctional Center Mental Health Unit (JHCC):

> Inmate has been here for almost two years and will not advocate for himself or his needs. Inmate will not communicate with staff, peers, or security. Inmate has about four phases [sic] that he will say that include, "I'm at peace;

I will not answer that; You are foolish; and I will not answer a question that I have already answered." . . . Inmate will not look at others and wears a blanket or towel over his head at all times. Inmate uncooperative with others and is unable to communicate what his needs are. When asked about discussing mental health . . . he will avoid the conversation . . . or will say he has already told someone else. . . . [He] is of no help to remedy his current mental health functioning. . . . Declines medication and won't even accept help to access canteen. He is not thriving as well as he can emotionally nor within the constraints of the system. Quality of life for him is low and he spends a lot the time in darkness. . . . Behavioral problems are increasing as [are] negative behaviors. . . . [He] refused to take medications or see psychiatrist for medications. This inmate suffers from a substantial disorder of: thought; mood; perception. Disorder grossly impairs: Judgement [sic]; Behavior; Capacity to recognize reality; Ability to meet the ordinary demands of life; Due to mental illness, the Inmate is: A substantial risk of harm to others; Gravely disabled such that he/she is unable to care for him/herself so that his/her health and/or safety is endangered.

Att. 18 at 593.

Mr. Nolen's decompensation resulted in his move to JHCC on January 6, 2020. Att. 18 at 405. He was initially sent for a fifteen-day observation and evaluation but remained there four months. Att. 18 at 288. 411-14, 422. Intake paperwork notes that he has "a history of psychosis with hearing voices and paranoia," is "often responding to internal stimuli," and has refused all medication. Mr. Nolen was then forcibly medicated, receiving Haloperidol/Haldol[21] decanoate (150mg) injections every three to four weeks as well as Zyprexa 10mg, another antipsychotic. Att. 18 at 397, 406, 413, 359. He was put on a twelve-week behavioral plan whereby Mr. Nolen could return to the Oklahoma State Penitentiary (OSP) "on completion of week 12 providing [he was] voluntarily compliant with injections and the intention to continue prescribed medication once back at OSP." Att.

---

[21] Haldol is an antipsychotic drug. *See* 4/4/17 Tr. 66.

18 at 496-98. Involuntary Medication Reports, among others, indicate Mr. Nolen has a diagnosis of "schizophrenia, chronic paranoid." *Id.* at 474, 485-87. In late March, Mr. Nolen's dosage of Haldol was decreased to 100mg because of its side effects, including drowsiness, drooling, and noticeable tremors. *See, e.g.*, Att. 18 at 315, 319, 327. It was decreased again to 75 mg after Mr. Nolen passed out in the shower and continued to have dizziness. *Id.* at 302, 310-11. Following completion of his twelve-week plan, Mr. Nolen was returned to OSP on May 1, 2020, on the condition that he would willingly take the Haldol injections and Zyprexa. *Id.* at 288.

This new evidence provides significant rebuttal to Drs. Roberson's and Orth's opinions throughout competency proceedings that Mr. Nolen is/was not suffering from a mental illness; and corroborates Dr. McGarrahan's opinions. Mr. Nolen is exhibiting the same or similar behavior that he has exhibited since his competency was at issue prior to trial. DOC doctors report delusions, paranoia, and psychosis, among other things; Mr. Nolen has been diagnosed with schizophrenia chronic paranoid; and he receives involuntary medication (now by agreement as a condition to remaining at OSP).

Mr. Nolen has shown by at least a preponderance of the evidence that he was unable to consult with counsel with a reasonable degree of rational understanding.

### C.    State Court Opinions

#### 1.    Direct Appeal Opinion

Mr. Nolen raised an incompetency claim on direct appeal. OCCA held that the district court's findings – both with respect to competency as it relates to intellectual disability and mental illness – were supported by the record and not an abuse of discretion

(i.e., not clearly against the logic and effect of the facts presented). *Nolen I*, 485 P.3d at 846; *id.* at 849 (ID); *id*. at 852 (mental illness). OCCA's decision was contrary to or an unreasonable application of clearly established federal law and relied on unreasonable findings of fact. *See* 28 U.S.C. § 2254(d).

*First*, regarding intellectual disability, OCCA unreasonably found that the trial court's determination, that there was evidence from Mr. Nolen's responses to Dr. Russell indicating his ability to assist in his defense, was supported by the record. *Nolen I*, 485 P.3d at 849 (referring to O.R. 105). Mr. Nolen's responses included his belief that the district attorney decided the penalty rather than the judge or jury and his belief that he himself was the one who made decisions reserved for the judge. Such a finding was unreasonable in light of the evidence presented in the state court proceeding.

*Second*, OCCA's broader determination that "the [trial] court's ruling is supported by the record," *id.*, is unreasonable because parts of its ruling were not supported by the record. The trial court found that Dr. Russell's report and testimony indicate that "he can communicate with counsel" and "is exercising his free will." O.R. 106. The finding ignores that Dr. Russell opined that Mr. Nolen lacked the capacity to work with a lawyer because of his intellectual deficits. The court's finding that "no other evidence of a defect . . . that would prevent Defendant from assisting in his defense," ignores Dr. Russell's findings of impairments in intellectual functioning, which the court itself credited in the same order.

*Third*, regarding mental illness, OCCA found that, following the August 17 dispositional hearing regarding competency, "the trial court leaned toward the conclusion that Nolen's decision not to cooperate was volitional, [but] given the gravity of the

proceedings, the trial court declined to accept Nolen's guilty plea without further inquiry." *Nolen I*, 485 P.3d at 850. However, the record is clear that the court's decision was based on the "victim's rights." *See supra*. Moreover, rather than "leaning toward" a finding of competency, the trial court explicitly stated, "I have doubt" as to whether he is competent. 8/17/16 Tr. 4. OCCA's determination of these facts was unreasonable. *See Grant v. Royal*, 886 F3d 874, 889 (10th Cir. 2018) (holding a state court's determination unreasonable where the court "plainly and materially misstated the record").

*Fourth*, OCCA's decision was contrary to and an unreasonable application of *Dusky* and *Cooper* – *Cooper* is a case with "materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). In *Cooper*, as here, the "[p]etitioner's competence was the focus of significant attention both before and during his trial." 517 U.S. at 350. After an initial finding of incompetence, Mr. Cooper was sent to a state mental health facility for treatment. *Id.* Upon his release, the court held competency hearing and, in light of conflicting expert opinions, deemed him competent. *Id.* at 351. A week before trial, defense counsel advised the court that Mr. Cooper was "behaving oddly and refusing to communicate with him," noting "it would be a serious matter 'if he's not faking.'" *Id.* The court did not revisit competency then, but on the first day of trial, "petitioner's bizarre behavior prompted" another inquiry. *Id.* At that point, the court, despite "voic[ing] uncertainty," found Mr. Cooper had not met his burden of clear and convincing evidence of competency. *Id.* at 352. Much like Mr. Nolen, "Mr. Cooper did not communicate with or sit near defense counsel during the trial. Through much of the proceedings he remained in prison overalls, crouching in the fetal position and talking to himself." *Id.* at 353 n.2. And like trial counsel

in this case, who made an ongoing effort to raise their competency concerns and seek continuances, *see, e.g.*, 4/7/17 Tr. 9; 9/14/17 Tr. 469; 9/19/17 Tr. 1228; 9/20/17 Tr. 1346; 10/10/17 Tr. 3488-89; 12/15/27 Tr. 3, Mr. Cooper's counsel "[i]n a final effort to protect his client's interests" moved for a mistrial or a renewed investigation into competency. 517 U.S. at 353.

The *Cooper* Court held that Oklahoma's clear and convincing evidence standard "allow[ed] the State to put to trial a defendant who is more likely than not incompetent," in violation of that defendant's right to due process. 517 U.S. at 369. OCCA's different determination on materially indistinguishable facts was unreasonable. *See* § 2254(d).

## 2. Post-Conviction Opinion

In post-conviction, Mr. Nolen proffered more than 800 pages of DOC mental health records from the time following conviction in 2017 until mid-2020, which corroborated that Mr. Nolen was incompetent at trial. *See* APCR, Att. 3. These records included documentation of Mr. Nolen's ongoing decompensation, transfer to a mental health unit at a separate institution, forced antipsychotic medication, a diagnosis by a DOC psychiatrist of schizophrenia chronic paranoid, and ongoing mental health reports of delusions, paranoia, and psychosis. *See supra*.

OCCA found that Mr. Nolen's "argument, on post-conviction, relies largely on evidence presented and considered below." Att. 1 at 7. The assertion that Mr. Nolen's post-conviction claim relied largely on evidence presented and considered previously is patently wrong because, in his claim:

There is a significant amount of new, detailed, and very persuasive information since the jury trial and direct appeal that Alton Nolen is still suffering from a very serious, dilapidating [sic] mental illness. This information directly corroborates Alton Nolen's attorneys at both the trial and direct appeal that Petitioner was not competent to stand trial in these proceedings.

APCR at 11. This new information – unavailable at the time of direct appeal – was the crux of the claim, as is clear from Mr. Nolen's application and attachments. OCCA's finding that the new claim "relie[d] largely on evidence presented and considered below," is wrong and should not be presumed correct. A comparison of Petitioner's direct appeal brief competency claim, D.A. Br. at 16-28, and his competency claim in his Application for Post-Conviction Relief provides clear and convincing evidence that the post-conviction claim was centered on the new evidence.

The state court's application of *res judicata* was erroneous. *Res judicata* "bars . . . parties from relitigating not only the adjudicated claim but also any theories or issues that were actually decided or *could have been* decided in that action." *Wilson v. Kane*, 852 P.2d 717, 722 (Okla. 1993). Mr. Nolen's post-conviction competency claim, relying on new evidence that was only available after his direct appeal, could not have been decided in his direct appeal and is not procedurally barred.

Mr. Nolen was tried while incompetent. The state court adjudication in *Nolen I* was contrary to and an unreasonable application of clearly established federal law regarding both intellectual disability and competency and relied on unreasonable fact findings. Given the totality of the evidence discussed above from pre-trial, trial, and post-conviction

proceedings, Mr. Nolen has demonstrated by clear and convincing evidence that he was, in fact, incompetent to stand trial. His convictions and sentences should be vacated.

III.  **THE GUILT PHASE ADMISSION OF GRUESOME, SHOCKING, IRRELEVANT, AND CUMULATIVE PHOTOS MADE MR. NOLEN'S TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL[22]**

A.  **Legal Standard**

The erroneous admission of gruesome, shocking, and disturbing photographs in the guilt phase of a criminal trial violates a defendant's due process rights if the photos "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (same); *cf. Spears v. Mullin*, 343 F.3d. 1215, 1229 (10th Cir. 2003) (holding that admission of gruesome crime scene photos rendered penalty phase fundamentally unfair and that OCCA ruling to the contrary was an unreasonable application of *Donnelly*).

B.  **The Admission of Four Gruesome Photos Was Fundamentally Unfair.**

Guilt phase issues of identity, cause of death, and manner of death were undisputed at Mr. Nolen's trial. Two Vaughan Foods' employees testified that they saw Mr. Nolen "sawing" the knife across Ms. Hufford's neck "in a very deep, cutting manner," which the defense did not dispute. Tr. 516-19, 532, 539 (Gary Hazelrigg); Tr. 635-36, 648-49, 653, 661 (Mark Vanderpool). And the medical examiner testified to cause and manner of death,

---

[22] Mr. Nolen raised this claim on pages 52-55 of his direct appeal brief.

also without dispute from the defense. Tr. 1340, 1344. Indeed, the defense conceded that Mr. Nolen killed Ms. Hufford by decapitation. Tr. 425-27, 2355-57. Further, State's Exhibits 45 and 46, admitted and published to the jury, showed "the location . . . and the status" of Ms. Hufford's body at the crime scene, and Exhibit 46 clearly showed her head severed from her body. Tr. 435-36; 707, 1038-39.

Still, the trial court, over defense objections, admitted State's Exhibits 102, 104, 108, and published them to the jury. These three exhibits were additional photos of Ms. Hufford's body at the crime scene. Tr. 443. The court also admitted and published to the jury State's Exhibit 193, which was an autopsy photo of just Ms. Hufford's head with the murder weapon lying on her left cheek. Tr. 1337-38. These four gruesome, inflammatory photographs only supported uncontested factual issues and were also cumulative of the extensive eyewitness and expert medical testimony as well as other more relevant photographic exhibits such as State's Exhibits 45 and 46. Tr. 1153, 1308-10.

Specifically, State's Exhibit 102, introduced through Detective Griffin, is a closeup photo of Ms. Hufford's body from the shoulders up, with part of her head visible near the body. Tr. 1172. The trial court said there is "[n]o doubt" that this exhibit is "extraordinarily prejudicial," Tr. 444; yet it admitted the photo because it purportedly showed "defensive wounds in the arms, which may be relevant to the testimony." *Id.* State's Exhibit 104, also introduced through Detective Griffin, is a photo of Ms. Hufford's upper torso alone, emphasizing that her body is missing a head. Tr. 1173. The court admitted the photo, asserting that it too showed defensive wounds. Tr. 445. But, in both State's Exhibits 102 and 104, there is nothing clearly showing defensive wounds: Ms. Hufford's hands are not

fully visible; and a lay witness could not distinguish whether the blood came from her torso or from defensive wounds. If the court and State were truly interested in showing defensive wounds, then State's Exhibits 109-111 – which the court barred as cumulative, Tr. 455, and which are closeup phots of Ms. Hufford's arms and hands that do not needlessly show a headless torso or severed head – would have been far more probative. Att. 22. Thus, State's Exhibits 102 and 104 only misled and improperly inflamed the jury.

Indeed, when medical examiner Dr. Nichols testified extensively about Ms. Hufford's defensive wounds, he did not even mention either State's Exhibit 102 or 104; rather he relied on clean, closeup autopsy photos taken at and by the medical examiner's office of the victim's arms, fingers, and hands showing the precise size of each wound, as seen in admitted State's Exhibits 163-66, 172-73, 175, and 179-81. *See* Tr. 1310, 1325-35, 1342-43. This is because, as the prosecution conceded, the medical examiner understandably "like[s] to look at their own pictures when they're making a decision." Tr. 463. State's Exhibits 102 and 104 were thus non-probative of defensive wounds and cumulative of ten State's exhibits actually showing defensive wounds.

Further, even if State's Exhibits 102 and 104 showed clear defensive wounds, their admission was still more prejudicial, confusing, and misleading than probative in the guilt phase because whether Ms. Hufford suffered defensive wounds was irrelevant to that stage, particularly as identity and cause and manner of death were undisputed.[23]

---

[23] The State mentioned "defensive injuries" only once in its guilt phase closing argument, Tr. 2348, and never argued that those injuries proved any part of its case.

Also, there is no difference between the prejudicial crime scene photos the court struck and State's Exhibits 102 and 104. For instance, the court struck State's Exhibit 105 (Att. 22) because it "gets to the point of traumatizing the jury as opposed to just proving the case." Tr. 445. But Exhibit 105 is just a closeup of Exhibits 102 and 104 so the same "traumatizing" argument should have excluded State's Exhibits 102 and 104 as well.

State's Exhibit 108 is very similar to State's Exhibits 45 and 46, except that it shows how law enforcement officers repositioned Ms. Hufford's head and a white scarf underneath her torso: they turned her head to face upward toward the camera and the photo observer and moved the scarf so that the observer can see it drenched in blood. Tr. 1173. *Compare* St. Ex. 108 *to* St. Exs. 45 and 46. Because the head and scarf had been repositioned, the photo had limited evidentiary value. Whether intentional or not, the repositioning of Ms. Hufford's fact looking upward could have easily stirred an emotional reaction in the jury; certainly, whether her severed head was face down or face up is irrelevant to any guilt phase issue. And the court, without explanation, denied admission of State's Exhibit 107 (Att. 22) but admitted Exhibit 108 even though it was simply a "stepped back version" of Exhibit 107. Tr. 446. Yet, Exhibit 108 is more prejudicial than the excluded zoomed-in photo Exhibit 107 because Exhibit 108 shows the victim's head decapitated from her body versus showing just a freestanding head in Exhibit 107.

Finally, State's Exhibit 193, introduced through Dr. Nichols, shows the victim's head on a table at the medical examiner's office, with the murder weapon held up to her left cheek. Tr. 1337-38. Again, neither cause of death, manner of death, nor identity of the perpetrator were disputed. Further, admitted State's Exhibits 189 and 196, photos also

taken at the medical examiner's office, show the same knife with the same serrations and the length noted with measuring tape, Tr. 464, 1175-76, 1336-37, but with nothing else inflammatory, such as a severed head, in the photograph. And admitted State's Exhibit 182 is a photo of the victim's chin wounds closeup without showing her fully severed head.

Mock jury experiments "have demonstrated that gruesome images can make mock jurors conviction prone and punitive in the criminal system." David A. Bright & Jane Goodman-Delahunty, *Gruesome Evidence and Emotion: Anger, Blame, and Jury Decision-Making*, 30 L. & Hum. Behav. 183, 196 (2006). This is because showing jurors gruesome photographs often results in intense emotional responses of disgust and anger, which "might motivate [jurors] to seek out information that justifies blaming and punishing a defendant and ignore information that contradicts that motivation." Jessica M. Salerno & Hannah J. Phalen, *The Impact of Gruesome Photographs on Mock Jurors' Emotional Responses and Decision Making in A Civil Case*, 69 DePaul L. Rev. 633, 639 (2020). Indeed, potential juror A.E. teared up just thinking about the photos. Tr. 237-38, 314. Similarly, the empaneled jurors could have rejected Mr. Nolen's insanity defense because of the adverse impact of their exposure to the unduly prejudicial photos.

There was no fact necessary to the State's burden of proof that only State's Exhibits 102, 104, 108, and 193 established.[24] Because jurors could have had misplaced emotional

---

[24] The State argued pre-trial that it may rely on Exhibits 102, 104, and 108 to support the heinous, atrocious, and cruel sentencing aggravating factor, but that argument had no relevance to any guilt phase burden of proof issue. Tr. 446.

responses to these photos, all four photos should have been excluded. Admitting these photos in the guilt phase was so unduly prejudicial as to make Mr. Nolen's trial fundamentally unfair, in violation of his Fifth, Sixth, and Fourteenth Amendment rights and clearly established federal law, including *Darden* and *Donnelly*.[25]

## C. OCCA's Opinion Was Factually and Legally Unreasonable.

On direct appeal, OCCA upheld the admission of State's Exhibits 102, 204, 108, and 193, stating that, "[w]hile gruesome, the probative value of these photographs, considered both individually and collectively, was not substantially outweighed by their prejudicial effect." *Nolen I*, 485 P.3d at 857. OCCA based this decision on a finding that "[t]he photographs at issue were relevant as they depicted the victim and crime scene, they illustrated the nature and extent of the wounds, and they corroborated the eyewitness testimony." *Id.* OCCA's decision was based on an unreasonable determination of the facts and was an unreasonable application of clearly established federal law, 28 U.S.C. § 2554(d)(1) and (2), for several reasons.

*First*, OCCA made erroneous fact findings, particularly that the contested photos show the nature and extent of the victim's wounds, "including defensive wounds." *Nolen I*, 485 P.3d at 857. State's Exhibit 108 does not show any defensive wounds, it is not clear what is shown wound-wise in State's Exhibits 102 and 104, and there is no record support that any of these exhibits show defensive wounds. Nor were they relied on for that purpose

---

[25] This constitutional violation had "a substantial and injurious effect" on the jury's determination of Mr. Nolen's guilt. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

by any trial witness, including the medical examiner, who did not refer to any of these three exhibits when discussing defensive wounds. *See Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (28 U.S.C. § 2254(d)(2) posed no bar to habeas relief where state court made "incorrect" factual assumption about records; "partial reliance on an erroneous factual finding" produced unreasonable state court decision).

*Second*, OCCA's assertion of relevance and probative value was based on an unreasonable application of clearly established federal law, including *Donnelly* and *Darden*. Particularly where there was no dispute as to identity, cause of death, or manner of death, State's Exhibits 45 and 46 – along with the autopsy photos and diagrams, and the testimony of two eyewitnesses and one medical expert – accomplished everything that OCCA found relevant about the contested photos. Absent the four inflammatory photos, this evidence still "depicted the victim and the crime scene" and "illustrated the nature and extent of the wounds." *Nolen I,* 485 P.3d at 857. State's Exhibits 45 and 46 along with the autopsy photos and diagrams as well as the medical testimony sufficiently "corroborated the eyewitness testimony." *Id.* By contrast, the four contested photos were merely cumulative exhibits not relevant to any disputed issue but were instead offered to mislead, confuse, and inflame the jury.

*Third*, OCCA's assertion that the probative value of these photographs was not substantially outweighed by their prejudicial effect was also based on an unreasonable application of clearly established federal law, including *Donnelly* and *Darden*. In only balancing the probative value against prejudicial effect, OCCA never weighed any probative value against other proper considerations such as misleading the jury, confusing

85

the issues, needlessly presenting cumulative evidence, and violating Mr. Nolen's rights to due process and a fair trial, all of which were present here. Thus, even if State's Exhibits 102, 104, 108, and 193, individually or collectively, had some limited probative value, that value was substantially outweighed by their emotional appeal, confusion of the issues, and misleading of the jury. OCCA's decision to the contrary was objectively unreasonable under the *Donnelly* and *Darden* fundamental unfairness standard. This claim should be reviewed de novo.

IV.   **THE ADMISSION OF AN IN-LIFE PHOTOGRAPH OF COLLEEN HUFFORD INJECTED PASSION, PREJUDICE, AND OTHER ARBITRARY AND IRRELEVANT FACTORS INTO MR. NOLEN'S TRIAL; AMENDED SECTION 2403 OF THE OKLAHOMA EVIDENCE CODE IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED TO MR. NOLEN'S TRIAL.[26]**

State's Exhibit 1, an in-life photograph of the victim, Colleen Hufford, was admitted into evidence over defense objection in the first stage of Mr. Nolen's trial. *See* Tr. 428-29, 512-13. The admission of the photograph violated Mr. Nolen's due process rights to a fundamentally fair trial and sentencing proceeding,[27] in violation of the Sixth, Eighth, and Fourteenth Amendments.[28]

OCCA rejected this claim on direct appeal, explaining that

---

[26] Mr. Nolen presented this claim on pages 56-58 of his direct appeal brief.
[27] The State incorporated all guilt-stage evidence into the sentencing stages. Tr. 3514-15. The State also displayed the in-life photograph of Ms. Hufford during its capital-sentencing-stage closing argument. *See* Tr. 3768.
[28] This constitutional violation had "a substantial and injurious effect" on the jury's determination of Mr. Nolen's guilt. *Brecht*, 507 U.S. at 637-38.

Title 12 O.S.2011, § 2403 specifically provides that "in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive."

*Nolen I*, 485 P.3d at 858. OCCA noted that "this Court has rejected challenges to the constitutionality of this statutory provision and found that the statute does not afford 'blanket admissibility' of such photographs because only one 'appropriate' in-life photograph is allowed and that photograph is subject to the balancing test set forth in Section 2403." *Id.* (citations omitted). The court concluded, "Nolen's argument does not overcome the presumption that legislative acts are constitutional." *Id.* (citation omitted).

Regarding Mr. Nolen's argument that the photograph's only purpose in the penalty phase was to elicit sympathy for the victim, OCCA reiterated its precedent that:

[I]n capital cases, in particular, it is constitutional to allow the sentencing jury an actual "quick glimpse" of the person who later became the victim in the case – before he or she was reduced to the corpse shown in crime scene photographs – through the admission of an "appropriate photograph of the victim while still alive."

*Id.* (quotation omitted). OCCA found that the photo was "an appropriate snapshot of the victim, offered to show her general appearance and condition while alive in accordance with Section 2403." *Id.* OCCA concluded "[t]he probative value of the photograph was not substantially outweighed by the danger of unfair prejudice" and "[t]he trial court did not abuse its discretion in allowing the photograph into evidence." *Id.*

OCCA's findings that the statute is constitutional on its face and as applied in this case were contrary to clearly established federal law, including *Payne v. Tennessee*, 501

U.S. 808, 825 (1991); *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994);[29] *Darden*, 477 U.S. at

179-83; and *Donnelly*, 416 U.S. at 643. In *Spears*, the Tenth Circuit explained:

> When, as here, habeas petitioners challenge the admission of photographic
> evidence as violative of the Constitution, this court considers "whether the
> admission of evidence . . . so infected the sentencing proceeding with
> unfairness as to render the jury's imposition of the death penalty a denial of
> due process." *Romano*[], 512 U.S. [at] 12[]; *see also Bruton v. United States*,
> 391 U.S. 123, 131 n. 6, 88 S. Ct. 1620, 20 L.Ed.2d 476 (1968) ("An important
> element of a fair trial is that a jury consider only relevant and competent
> evidence. . . .").

343 F.3d at 1226; *see also Payne*, 501 U.S. at 825 ("In the event that evidence is introduced

that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process

Clause of the Fourteenth Amendment provides a mechanism for relief.").

Here, contrary to OCCA's adjudication, Okla. Stat. tit. 12, § 2403 is unconstitutional

on its face, as it mandates that "in a prosecution for any criminal homicide, an appropriate

photograph of the victim while alive *shall be admissible*," *id.* (emphasis added), without

regard to whether the photograph is "relevant and competent" evidence, *Bruton*, 391 U.S.

at 131 n.6, or whether it "is so unduly prejudicial that it renders the trial fundamentally

unfair," *Payne*, 501 U.S. at 825. Such an unlimited statutory mandate is contrary to clearly

established federal law, including *Payne*, *Romano*, *Darden*, and *Donnelly*, which ensures

the admissibility of evidence considers the protections of due process.

---

[29] The *Romano* Court determined "the proper analytical framework" for considering
whether the introduction of certain evidence violated due process was "found in *Donnelly*,"
where the Court "sought to determine whether [a] prosecutor's remark 'so infected the trial
with unfairness as to make the resulting conviction a denial of due process.'" *Romano*, 512
U.S. at 12 (quoting *Donnelly*, 416 U.S. at 643).

Furthermore, OCCA unreasonably found that the photograph was constitutionally admitted in the first stage of Mr. Nolen's trial. Although OCCA found "[t]he photograph was . . . offered to show [the victim's] general appearance and condition while alive," and "[t]he probative value of the photograph was not substantially outweighed by the danger of unfair prejudice," OCCA did not explain why Ms. Hufford's "general appearance and condition while alive" were relevant to the first stage. *Nolen I*, 485 P.3d at 858. Nor could OCCA have done so, as Ms. Hufford's appearance while alive had no tendency to make any fact of consequence more or less probable. *See* Okla. Stat. tit. 12, § 2401 (2011); *Sparrow v. Leibach*, No. 3:17-cv-00717, 2018 WL 4352710, *9 (M.D. Tenn. Sept. 12, 2018) (finding error where an in-life photograph was admitted when "there was no issue about the victim's identity or about his being alive prior to the crime," and "[a]s such, there was little, if any, relevance to the photograph," but finding the error harmless). Instead, the photograph of Ms. Hufford while she was alive served solely to impermissibly elicit the jury's sympathy in the first stage. *See People v. Harris*, 118 P.3d 545, 561 (Cal. 2005) ("Courts should be cautious in the guilt phase about admitting photographs of murder victims while alive, given the risk that the photograph will merely generate sympathy for the victims. . . . But the possibility that a photograph will generate sympathy does not compel its exclusion *if it is otherwise relevan*t." (emphasis added) (citations omitted)). The in-life photograph of Ms. Hufford during the first stage was irrelevant and unduly prejudicial, rendering Mr. Nolen's trial fundamentally unfair, in violation of clearly established federal law, including *Payne*, *Romano*, *Darden*, and *Donnelly*.

Finally, with respect to the capital sentencing stage, OCCA unreasonably found that it was "constitutional to allow the sentencing jury an actual quick glimpse'" of Ms. Hufford while alive. *Nolen I*, 485 P.3d at 858 (citation and internal quotation marks omitted). Contrary to OCCA's finding, the photograph "so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Romano*, 512 U.S. at 12. Ms. Hufford's "appearance and condition while alive," *Nolen I*, 485 P.3d at 858, were irrelevant to Mr. Nolen's sentence. The *Payne* Court held that "a State may properly conclude that, for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the *specific harm* caused by the defendant." *Payne*, 501 U.S. at 825 (emphasis added). It further held that "[a] State may legitimately conclude that *evidence about the victim and about the impact of the murder on the victim's family* is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827 (emphasis added). The jury in Mr. Nolen's case heard such evidence, as Ms. Hufford's daughter provided a victim impact statement in the capital sentencing stage. Tr. 3609-14. Unlike this victim impact statement, the in-life photograph of Ms. Hufford had no tendency to prove "the specific harm caused by the defendant" or "the impact of the murder on the victim's family."[30] *Id.* at 825. Instead, the presentation of the in-life photograph only served to garner sympathy

---

[30] Nor did the in-life photograph "bear[] upon the character of, or the harm imposed upon, the victim[]." *Payne*, 501 U.S. at 826 (citation and internal quotation marks omitted).

for the victim.[31] The irrelevant photograph was so unduly prejudicial that it rendered Mr. Nolen's capital sentencing stage fundamentally unfair, in violation of clearly established federal law, including *Payne*, *Romano*, *Darden*, and *Donnelly*.

## V. MR. NOLEN'S DEATH SENTENCE VIOLATES THE SIXTH AND FOURTEENTH AMENDMENTS BECAUSE THE TRIAL COURT ERRONEOUSLY DENIED HIS LEGALLY JUSTIFIED CAUSE CHALLENGES TO TWO JURORS WHO COULD NOT MEANINGFULLY CONSIDER ALL SENTENCING OPTIONS.[32]

### A. Legal Standard

A prospective juror in a capital case must be excluded for cause if "the juror's views [on the death penalty] would prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). "In essence, the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial 'indifferent' jurors." *Morgan v. Illinois,* 504 U.S. 719, 727 (1992).

Under this standard, a juror's impairment and impartiality need not be proved with "unmistakable clarity" before they should be removed for cause. *Witt,* 469 U.S. at 424. The constitutional requirement of an impartial jury is violated if even a single juror is unable to carry out their sworn duties. *See Ross v. Oklahoma,* 487 U.S. 81, 85 (1988).

---

[31] The State's use of the photograph during its capital-sentencing closing argument left no question about the purpose of the photograph's presentation to the jury. As described in Claim III, the prosecutor improperly inflamed the passions of the jury by presenting the in-life photograph alongside gruesome photographs and arguing, "Ladies and Gentlemen, he turned this into this. He turned this beautiful lady into this on the floor, this and this (indicating)." Tr. 3768.

[32] Mr. Nolen raised this claim on pages 29-42 of his direct appeal brief.

## B. The Trial Court's Denial of Defense Cause Challenges to Two Potential Jurors Violated Mr. Nolen's Constitutional Rights.

The trial court violated Mr. Nolen's constitutional rights to an impartial jury and due process by denying the defense's cause challenges to prospective jurors A.E. and L.L. because voir dire questioning showed that neither could meaningfully consider non-death sentences and thus their duties as jurors would be substantially impaired.

Potential juror A.E. expressed a "reservation" about voting for a life sentence with parole. Tr. Panel C, 42-43. On further questioning, she stated that if she had to look at "graphic pictures" of the crime, a vote for "life without parole would be extremely hard and checked off rather quickly." Tr. 237-38. She even "tear[ed] up" when discussing the photos. *Id.* at 314. A.E. also explained that if the jury found Mr. Nolen guilty during the penalty phase, the crime scene photos would be "burned into [her] head" and thus it would be "very" hard to vote for a life with parole sentence. *Id.* at 240. A.E. then stated she could only give meaningful consideration to a life with parole sentence if the defense presented evidence to counter the photos, which the defense had no obligation to do. *Id.* at 240-41.

Between expecting the defense to present counter evidence and her emotional response to the crime scene photos, A.E. made clear that she could not give meaningful consideration to a life with parole sentence. A.E. had formed an opinion against a life with parole sentence before hearing the evidence and "'a [potential] juror who has formed an opinion cannot be impartial.'" *Morgan, 504 U.S. at 727* (quoting *Reynolds v. United States*, 98 U.S. 145, 155 (1879)). Because A.E. had "strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will

combat that testimony and resist its force," she should have been stricken for cause. *Reynolds*, 98 U.S. at 155. Because a potential juror's impairment and impartiality need not be proved with "unmistakable clarity" before they should be removed for cause, *Witt,* 469 U.S. at 424, any ambiguity in A.E.'s answers does not negate the propriety of the defense's cause challenge. Because A.E. could not give meaningful consideration to a life with parole sentence, the trial court's cause challenge denial was constitutional error under the *Witt/Morgan* standard.

In response to an extensive colloquy from defense counsel, potential juror L.L. stated that he has supported the death penalty for "most of [his] life" based on the "eye for an eye" standard. Tr. Panel D, 71. He further stated that if he found a murder to be "premeditated," "deliberate," and "intentional" and also found the defendant to be "sane," then he would automatically vote for a death sentence. *Id.* at 71-73. In other words, if L.L. found a defendant guilty of first-degree murder in the guilt phase, which was a necessary condition to any capital penalty phase, he would always vote for death in the sentencing stage. L.L. made clear that in such a situation the defendant "should get the death penalty." *Id.* at 73. L.L. gave lengthy explanations, based on "eye for an eye" principles, as to why he felt that way. *Id.* at 71-73.

The trial court later followed up with L.L. and asked him whether he would "automatically impose" a death sentence for first degree murder and he responded "no." *Id.* at 85. In response to an additional leading question from the court if he could "consider all three punishments at the sentencing phase," L.L. responded "correct." *Id.* The trial court stated that it asked these follow-up questions because it thought that L.L. was a "little

confused by some of [defense counsel's] questions" and "wasn't sure he was understanding." *Id.*at 86. But, during questioning by defense counsel, L.L. was not simply giving "yes" or "no" responses like he did during the court's questioning; rather, he was giving lengthy explanations for his steadfast position that made it abundantly clear that he was not confused by or misunderstanding defense counsel's questions. Thus, L.L.'s detailed, explanatory answers to defense counsel's questions are more probative of his unwillingness to meaningfully consider non-death sentences as opposed to his one-word answers to the trial court's leading questions.

L.L.'s responses to defense counsel's clear voir dire questions "made it unmistakably clear that he could not be trusted to abide by existing law and to follow conscientiously the instructions of the trial judge." *Witt*, 469 U.S. at 419. Like with A.E., because L.L. could not give meaningful consideration to non-death sentences, the trial court's cause challenge denial was constitutional error under the *Witt/Morgan* standard. The constitutional requirement of an impartial jury is violated if even a single juror is unable to carry out their sworn duties, *Ross*, 487 U.S. at 85. Here, Mr. Nolen's constitutional rights were violated by denial of cause challenges to either L.L. or A.E., and certainly to both.

### C.    OCCA's Opinion was Factually and Legally Unreasonable.

OCCA's decision was based on an unreasonable determination of the facts and was an unreasonable application of clearly established federal law for several reasons.

*First*, OCCA ignored relevant facts showing that A.E. could not give meaningful consideration to a life with parole sentence. In Particular, OCCA ignored that A.E. teared

up when explaining that the crime scene photos the jury would have to review would preclude her from considering a life with parole sentence, indicating that she was so emotional that she could not meaningfully consider all three sentencing options. Instead, OCCA just noted that A.E. could "imagine" a life with parole sentence. *Nolen I*, 485 P.3d at 855. A state court decision is unreasonable under § 2254(d)(2) when the state court "had before it, and apparently ignored," evidence supporting petitioner's claim. *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003).

*Second*, OCCA ignored relevant facts showing that L.L. could not give meaningful consideration to a non-death sentence. OCCA alleged that L.L. "clarified" in response to follow-up questions from the trial court that he could consider all three punishment options. *Nolen I*, 485 P.3d at 855. This ignores that L.L. simply gave one word "yes" or "no" answers in response to the court's leading questions and L.L.'s lengthy answers to defense counsel's questions showing he would automatically impose death in a first-degree murder case because of his "eye for an eye" beliefs, from which he never wavered.

*Third*, OCCA's ruling as to both A.E. and L.L. involved an unreasonable application of *Witt* because OCCA ignored answers from these prospective jurors showing their bias and instead focused only on their answers that suggested they could consider all three sentencing options. But a juror's impairment and impartiality need not be proved with "unmistakable clarity" before they should be removed for cause. *Witt,* 469 U.S. at 424. Thus, OCCA failed to apply the proper legal standard in assessing whether A.E. and L.L. could impartially consider all sentencing options in a capital case.

Mr. Nolen is entitled to de novo review of this claim. Because A.E. and/or L.L. should have been stricken for cause, Mr. Nolen is entitled to habeas relief on this claim in the form of a new sentencing hearing.

## VI. APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO PRESENT A CLAIM THAT MR. NOLEN WAS DENIED HIS RIGHT TO A FAIR TRIAL BEFORE AN IMPARTIAL JURY.[33]

Appellate counsel were ineffective for failing to raise and litigate a claim that Mr. Nolen was denied his right to a fair trial before an impartial jury because a seated juror's misrepresentations and omissions in voir dire on material issues supported a cause strike.

### A. Legal Standard

The Sixth, Eighth, and Fourteenth Amendments to the United States Constitution guarantee a defendant on trial for his life the right to an impartial jury. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A new trial is required where even a single juror failed to disclose material information in response to a question asked during voir dire if "a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

---

[33] Mr. Nolen presented this ineffective-assistance-of-appellate-counsel claim on pages 48-49 of his application for post-conviction relief. He separately presented the underlying biased-juror claim on pages 33-39 of his application for post-conviction relief.

**B.    Juror N.L.'s Misrepresentations and Omissions Denied Mr. Nolen the Right to a Fair Trial Before an Impartial Jury.**

Seated juror N.L. made repeated misrepresentations and omissions both in her juror questionnaire and during voir dire regarding her history with the criminal justice system.[34] Her former husband was charged with and convicted of lewd molestation of juror N.L.'s teenage daughter in Cleveland County, Oklahoma. *See* APCR, Att. 7. N.L. also filed for a protective order, which was later issued, in a Cleveland County case on behalf of her minor daughter. *See id.* And another former husband was charged in Cleveland County with, and pled guilty to, assault and battery upon N.L. for striking her in the face with his fist. *See id.* N.L. applied for a protective order against that husband, asserting she suffered: "pulled hair, slapped, hit with fist, and cut hands up when thrown in chair." *See id.*

But, in N.L.'s juror questionnaire, she failed to disclose this extensive history with the criminal court system. Instead, she wrote that she had never appeared as a witness in any court proceeding and that none of her immediate family had ever been a defendant in a criminal court case. *See* APCR, Att. 8. She did not disclose her former husbands' criminal convictions in cases in which she and her daughter were victims. In response to the question, "Have you, any member of your immediate family, or any close friend been the victim of a crime?," N.L. disclosed only that a friend had been murdered, and not that she and her daughter had also been crime victims. *Id.*

---

[34] Direct-appeal and post-conviction counsel's investigations revealed the falsities of juror N.L.'s representations. *See* APCR, Atts. 7-8.

Then, N.L. continued her misrepresentations and omissions during jury selection. When the court asked the panel of prospective jurors on which N.L. sat whether anyone had had a case handled, either for or against them, by the Cleveland County District Attorney's Office, all prospective jurors, including N.L., answered in the negative, even though that office handled both of her former husbands' cases. Tr. Panel B, 7. She also remained silent after the judge noted that the "DA's Office does a lot of things from bogus checks to child support enforcement to criminal prosecutions" and asked: "You personally, close friend of yours, family member, ever had any contact with the DA's office?" *Id.* at 7-8. She again remained silent through the judge's questioning of jurors with experiences with the District Attorney's Office, and who had family who were crime victims, about whether these experiences would affect their ability to be fair. *Id.* at 8-11. At the end of this questioning, the court asked, "Anybody else? Did I miss anyone?"; N.L. remained silent. *Id.* at 11. When the judge asked if anyone else had a reason they could not sit as a fair and impartial juror, N.L. continued to remain silent. *Id.* at 37. Finally, the judge offered, "Any time you're uncomfortable giving a response to any questions . . . we can certainly take a break, do it in here . . . without everyone else in the room. . . . If you're thinking in your head, I might have something to say about that, throw it out there." *Id.* at 38. Despite multiple questions, N.L. omitted material information.

The crimes of which juror N.L. and her daughter were victims and the crimes for which Mr. Nolen was on trial were similar because all involved male-on-female physical attacks. But for N.L.s' omissions about her involvement in the criminal justice system and being a victim of violence, there would have been a valid basis for a cause strike.

### C.     Appellate Counsel's Ineffectiveness

Appellate counsel's failure to raise a viable claim of juror bias constitutes ineffective assistance of counsel if counsel's performance was deficient and there was prejudice. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (applying *Strickland*[35] standard).

Specifically, if appellate counsel had no reasonable basis for not litigating juror bias, if the underlying issue was valid, and if there was a reasonable probability that the omitted claim would have resulted in a reversal on appeal, counsel was ineffective. Appellate counsel had no reasonable basis for not bringing this claim on direct appeal and had they done so, there is a reasonable likelihood of a different direct appeal outcome.

### D.     OCCA's Adjudication Was Legally and Factually Unreasonable.

OCCA's adjudication of this claim in post-conviction proceedings was contrary to or an unreasonable application of clearly established federal law and based on unreasonable determinations of fact for several reasons.

*First*, OCCA's ruling that "[an appellant] must show actual injury from a juror's non-disclosure," and that Mr. Nolen was "unable to show" injury, Att. 1 at 19, was contrary to clearly established federal law because the constitutional right to an impartial jury is not subject to harmless error analysis. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (citing *Chapman v. California*, 386 U.S. 18, 23 (1967)).

---

[35] *Strickland v. Washington*, 466 U.S. 668 (1984).

*Second*, in applying its own test focused on whether the outcome of the trial was affected, Att. 1 at 19 (citation omitted), OCCA ruled contrary to *McDonough*, which requires only "that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 554.

*Third*, in applying its own test focused on "material[ity]," "injury," and whether the outcome of the trial was affected, Att. 1 at 19, OCCA failed to assess juror N.L.'s actual or implied bias, contrary to clearly established federal law, including *McDonough* and *Irvin*. To the extent that OCCA's determinations regarding "material[ity]," "injury," and effect on the trial included findings that juror N.L. was not biased, OCCA unreasonably applied clearly established federal law, and these findings were factually unreasonable. Att. 1 at 19.

## VII. PROSECUTORIAL MISCONDUCT DENIED MR. NOLEN HIS DUE PROCESS RIGHTS TO A FAIR TRIAL AND RELIABLE SENTENCING IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.[36]

Prosecutorial misconduct infected all stages of Mr. Nolen's trial, preventing him from receiving a fair trial and reliable sentencing hearing.[37] *See Donnelly*, 416 U.S. at 643. "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S.

---

[36] Mr. Nolen presented this claim on pages 75-80 of his direct appeal brief.

[37] This constitutional violation had "a substantial and injurious effect" on the jury's determination of Mr. Nolen's guilt and sentences. *Brecht*, 507 U.S. at 637-38; *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007).

at 181 (quoting *Donnelly*, 416 U.S. at 643). Heightened scrutiny is required when the misconduct infringes on a specific constitutional right. *Donnelly*, 416 U.S. at 643; *see also Paxton v. Ward*, 199 F.3d 1197, 1217 (10th Cir. 1999) (explaining that "a claim that the misconduct effectively deprived the defendant of a specific constitutional right . . . may be a basis for relief without proof that the entire proceeding was unfair"). Moreover, the Supreme Court has found a "heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). Prosecutorial misconduct can "so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment." *Id.*

Prosecutors denied Mr. Nolen's due process rights when they elicited sympathy for the victim, denigrated the defense, and inflamed the passions of the jury. On direct appeal, OCCA unreasonably determined that none of the alleged instances of misconduct amounted to plain error. *See Nolen I*, 485 P.3d at 859-60.

### A. Prosecutors Improperly Elicited Sympathy for the Victim, Denigrated the Defense, and Inflamed the Passions of the Jury.

In the State's first-stage opening, the prosecutor elicited sympathy for the victim:

> Now, listen, very closely, ladies and gentlemen, as I tell you about how this defendant brutally and ferociously murdered Colleen Hufford, *one of the most beautiful and caring ladies that you'll ever meet*[,] by beheading her at Vaughan Foods in Moore, Oklahoma.

Tr. 412 (emphasis added).

During first-stage closing arguments, the prosecutor again elicited sympathy by repeatedly arguing that the jury should be "talking about Colleen" rather than considering

101

the evidence in support of Mr. Nolen's insanity defense. Tr. 2396, 2397, 2398. With these arguments, the prosecutor also denigrated the evidence in support of the insanity defense, suggesting the defense presented it to hoodwink or distract the jury:

> And don't you see what's happening? These are good lawyers over here, but they have a client that's committed a horrible, horrible crime with tons of eyewitnesses, DNA, a confession, a defendant who wants to plead guilty and get the death penalty. And now he sits over there, shutdown, because he didn't get his way, mad, and he's in protest.
> Because here's the thing, if . . . you get back to the jury room and you're just talking about all of these doctors and who said what and all that and go back and read and all of that, you're not talking about Colleen. You're not talking about what happened to Colleen.

Tr. 2396. The prosecutor continued this theme at length. *See* Tr. 2396-98. Defense counsel objected twice because "[i]t has nothing to do with this stage of the proceedings," Tr. 2396, 2397-98, but the trial court overruled the objections because "[i]t's res gestae" and "[the prosecutor] can argue the evidence," Tr. 2396, 2397.

Finally, in the sentencing-stage closing argument, the prosecutor compared the in-life photograph of Ms. Hufford (State's Ex. 1) to the gruesome photographs (State's Exs. 102, 104, 108, and 193), *see* Claims II and III, *supra*, in an inflammatory before-and-after demonstration: "Ladies and Gentlemen, he turned this into this. He turned this beautiful lady into this on the floor, this and this (indicating)." Tr. 3768.

### B.    OCCA's Adjudication Was Legally and Factually Unreasonable.

OCCA's finding of no error was contrary to or an unreasonable application of clearly established federal law, including *Darden*, *Donnelly*, and *Caldwell*. Contrary to OCCA's finding, the prosecutor's improper comments and arguments prevented Mr. Nolen from having a fair trial and reliable sentencing proceeding. "It is a hallmark of a fair and

civilized justice system that verdicts be based on reason, not emotion, revenge, or even sympathy." *Le v. Mullin*, 311 F.3d 1002, 1015 (10th Cir. 2002). The Tenth Circuit does "not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision." *Moore v. Gibson*, 195 F.3d 1152, 1172 & n.11 (10th Cir. 1999). "A prosecutor may not use closing argument to inflame the passions and prejudices of the jury." *Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005) (citing *United States v. Young*, 470 U.S. 1, 8 n.5 (1985); *United States v. Pena*, 930 F.2d 1486, 1490-91 (10th Cir. 1991)).

Contrary to OCCA's finding, the misconduct "so affect[ed] the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment." *Caldwell*, 472 U.S. at 340. "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977). "Arguments that improperly encourage the jury to impose a sentence of death based on considerations of sympathy for the victims may constitute due process error." *Le*, 311 F.3d at 1015 (citations omitted)).

## VIII. APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO RAISE PROSECUTORIAL MISCONDUCT AND TRIAL COUNSEL'S INEFFECTIVENESS IN FAILING TO OBJECT TO THE MISCONDUCT, VIOLATING MR. NOLEN'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.[38]

Appellate counsel raised certain instances of prosecutorial misconduct[39] but failed to raise several others, which were later raised on post-conviction. Appellate counsel also failed to raise a claim of ineffective assistance of trial counsel based on counsel's failure to object to much of the prosecutorial misconduct. Under *Strickland*, "ineffective appellate assistance can be established on the basis of the demonstrable merit of the issue omitted by counsel on the petitioner's direct appeal." *Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003). Here, the underlying issues – prosecutorial misconduct and trial counsel ineffectiveness – had demonstrable merit, and there was "a reasonable probability that the omitted claim[s] would have resulted in a reversal on appeal." *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).

### A. Appellate Counsel Was Ineffective for Failing to Raise a Claim of Prosecutorial Misconduct.

Prosecutorial misconduct occurred repeatedly throughout Mr. Nolen's trial, preventing him from receiving a fair trial and reliable sentencing hearing. The State: (1) asked jurors to put themselves in the victims' places; (2) misstated facts in evidence; (3)

---

[38] Mr. Nolen presented this ineffective-assistance-of-appellate-counsel on pages 48-49 of his application for post-conviction relief. He separately presented the underlying claims of prosecutorial misconduct and ineffective assistance of trial counsel on pages 39-47 and on pages 47-48, respectively, of his application for post-conviction relief.
[39] *See* Claim VII.

appealed to societal alarm; (4) appealed to the jury's sympathy and emotion; and (5) equated a death penalty verdict with "justice" and argued it was the "right thing." This "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Given the heightened need for reliability in a capital case, *see Caldwell*, 472 U.S. at 340, the misconduct "so affect[ed] the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment," *id.*

While appellate counsel raised some instances of misconduct, they had no reasonable basis for failing to raise these five instances. On post-conviction, OCCA found, "Appellate counsel's failure to raise [this] issue[] . . . neither evinced deficient performance nor prejudiced Nolen." Att. 1 at 18. OCCA did not explain its reasoning for finding no deficient performance, but there can be no reasonable basis here. The prosecutorial misconduct issue had merit, *see Cargle*, 317 F.3d at 1205, and OCCA's findings were contrary to or unreasonable applications of clearly established federal law, including *Darden*, *Donnelly*, and *Caldwell*, and were based on unreasonable factual determinations. OCCA's finding that appellate counsel did not perform deficiently in failing to raise this issue was contrary to or an unreasonable application of *Strickland*. *See* 466 U.S. at 687.

OCCA concluded that it would dispose of Mr. Nolen's ineffective-assistance-of-appellate-counsel claim based on the prejudice prong of *Strickland*, Att. 1 at 13, and that "determining prejudice in this context requires examining the merits of omitted issues," Att. 1 at 14. OCCA's determination that the underlying prosecutorial misconduct claim lacked merit was contrary to or an unreasonable application of clearly established federal law, including *Darden*, *Donnelly*, and *Caldwell*. OCCA's findings regarding the merit of

the prosecutorial misconduct claim were also based on unreasonable determinations of fact.

Appellate counsel's failure to raise the claim prejudiced Mr. Nolen because it had a

reasonable probability of success on appeal. OCCA's finding of no prejudice was contrary

to or an unreasonable application of *Strickland*.

### 1. Asking the Jurors to Put Themselves in the Victims' Places.

During second-stage closing arguments, the sentencing stage for Counts 2 to 6, the

prosecutor improperly asked the jurors to put themselves in the places of the victims:

> We all know what it feels like to get a little-bitty cut. . . . [Traci
> Johnson] had cuts all over her fingers from pushing that knife back. Because
> you don't think about that. You want to live. You want to live, and you push
> back, even on something that is slicing into your fingers. And that's what she
> did that day.
> You can consider how terrified she had to be, how scared she had to
> be that she was going to die. . . .
> You should consider how Traci Johnson felt that day. . . .
> Consider the fear in their voices even today.[40] For all that those
> people went through that day, all that they saw and all that they heard. . . .

Tr. 2471-72. In the capital-sentencing-stage closing arguments, the prosecution similarly

argued:

> So he starts sawing on [Ms. Hufford's] neck. And you have to think about
> how that must feel. You know you're going to die and the only one who can
> maybe stop it is yourself. And so you start to fight. And then for a moment
> you think Gary is here and Gary can help me.[41]

---

[40] Referring to her testifying in court, the prosecutor argued, "She held my hand the whole
way going up there," Tr. 2472, to which an objection was sustained.

[41] Gary refers to Gary Hazelrigg, a fellow employee who attempted to intervene. Tr. 2466.

Tr. 3742-43. Defense counsel objected on the basis that it "is inappropriate for her to have the jurors put themselves in the victim's place." Tr. 3743. The court ruled, "I do not want you to ask them to step in that, but imagine what she felt is perfectly permissible. . . ." Tr. 3743. The State continued:

> [Y]ou have to imagine what she felt. For a moment maybe Gary could help her and maybe she would live and maybe she would get to see her daughter and her husband again. But he couldn't help her. You can imagine the terror, the anguish, the panic as she fought for her life. Two minutes.

Tr. 3744.

OCCA found that "a prosecutor may ask jurors to put themselves in a victim's place while describing the victim's experience, as long as the argument is based on the evidence," Att. 1 at 16 (citation and internal quotation marks omitted), and that "[t]he comments at issue here were based on the evidence and were not error." Att. 1 at 16.

OCCA's finding of no error was based on an unreasonable determination of facts. The prosecutor's argument, which referred to "you" – meaning the jurors – "want[ing] to live"; "push[ing] back," "even on something that is slicing *your* fingers"; "know[ing] *you're* going to die"; "start[ing] to fight"; and "think[ing] Gary is here" – was not "based on the evidence." Tr. 2471-72, 3742-44 (emphasis added).

OCCA's finding of no error was also contrary to or an unreasonable application of clearly established federal law, including *Darden*, *Donnelly*, and *Caldwell*. "Arguments that improperly encourage the jury to impose a sentence of death based on considerations of sympathy for the victims may constitute due process error." *Le*, 311 F.3d at 1015. "It is of vital importance to the defendant and to the community that any decision to impose the

107

death sentence be, and appear to be, based on reason rather than caprice or emotion."
*Gardner v. Florida*, 430 U.S. 349, 358 (1977).

## 2. The Prosecutor Misstated Facts in Evidence.

In first-stage closing, the prosecutor argued, "Psychosis doesn't pop up and down. It doesn't pop up when it's convenient to explain a killing. . . ." Tr. 2331. The prosecutor later added, "You're not psychotic, you're just fine, all of your co-workers think you're fine. . . . [T]hat's not how mental illness works." Tr. 2331-32. In making these arguments, the prosecutor misstated the facts in evidence. Kay Auwen from Vaughan Foods testified about a "weird" encounter she had with Mr. Nolen at the plant that made her "very uncomfortable." Tr. 615-22. Latosha Davis from the human resources department at Vaughan Foods testified about several interactions she had with Mr. Nolen that were unusual or made her feel "very uncomfortable." Tr. 923-39. Likewise, experts from both sides testified that people can have an onset of schizophrenia in their early thirties. *See* Tr. 1592 (Dr. McGarrahan); Tr. 2226-27 (Dr. Steffan).

OCCA unreasonably found that "[w]hile prosecutors may not misstate the evidence, they are allowed to comment upon it and draw logical inferences therefrom. . . . The prosecutor did not misstate the evidence and Nolen's argument to the contrary is without merit." Att.1 at 17 (internal citation omitted). OCCA's finding of no error was based on an unreasonable determination of facts; that Mr. Nolen could not have had a mental illness because he was "just fine, all of [his] co-workers th[ought he was] fine" was not a logical inference to draw from the testimony of Mr. Nolen's co-workers who testified about "weird" encounters that made them "very uncomfortable." Tr. 615-22; Tr. 923-39; Tr.

2331. OCCA's finding of no error was also contrary to or an unreasonable application of clearly established federal law, including *Darden*, *Donnelly*, and *Caldwell*.

### 3. The Prosecutor Improperly Appealed to Societal Alarm.

In first-stage closing argument, the prosecutor attempted to scare the jury into falsely believing the mental hospital would not confine Mr. Nolen if the jury found him not guilty by reason of insanity:

> Instruction 33, again if you decide the defendant was insane, then that's what happens to him. He goes to confinement in a mental hospital. By the way, you've heard that's OFC, until the court determines that the defendant is not at the time dangerous to the public on account of mental illness.
> So he's going to go back to the hospital that's already said he doesn't have a mental illness.

Tr. 2392. Defense counsel objected and requested a mistrial. Tr. 2392-93. The judge found the State's argument "inappropriate" but denied the request for mistrial and told the jury to "[r]ead the instruction rather than counsel's interpretation of it." Tr. 2393; *see* O.R.1430.

OCCA found appellate counsel was not ineffective for failing to raise this issue because "the error was cured by the trial court's admonishment." Att. 1 at 17 (citation omitted). Contrary to OCCA's unreasonable finding, the error was not cured by the admonishment. Instruction 33, to which the trial court directed the jury, says:

> If you decide that the defendant was insane at the time of the commission of the crime charged, the defendant shall not be released from confinement in a mental hospital until the court determines that the defendant is not at that time dangerous to the public peace and safety by being a risk of harm to himself or others on account of a mental illness.

O.R.1430. This instruction did not negate the State's misleading attempt to scare the jury into believing that if it found Mr. Nolen not guilty by reason of insanity, the hospital would

not confine him because it "already said he doesn't have a mental illness." Tr. 2392. The jury could still fear the hospital would again find Mr. Nolen "doesn't have a mental illness," Tr. 2392, and that the court might therefore allow his release.

OCCA's findings were also contrary to or an unreasonable application of clearly established federal law, including *Darden*, *Donnelly*, and *Caldwell*. *See Gov't of the Virgin Islands v. Mills*, 821 F.3d 448, 458 (3d Cir. 2016) (finding error where "the prosecutors . . . repeatedly suggest[ed] that the jurors themselves were not safe in their homes as long as [the defendant] was at large").

### 4.    The Prosecutor Appealed to the Jury's Sympathy and Emotions.

In the second-stage closing argument, the prosecutor appealed to the jury's sympathy and emotions:

> [Y]ou should consider the actions that people took on this particular day. And those actions . . . was [sic] to try to save Colleen Hufford. Gary Hazelrigg was the first one who fought for Colleen, and you should consider what he had to see and what he had to hear. He talked to you about how he heard a violent – and could see a violent – sawing violently across Colleen's neck, that he could hear her bones cracking. He could hear muscle and tissue tearing. . . .
> [H]e had been trying to pull Colleen away from him, in essence, trying to pull him off of Colleen.
> His clothes were bloody, his hands were bloody, and he's trying to pull him off and do his best to save his coworker, and a woman that apparently was adored by everyone. . . .

Tr. 2466-67. The prosecutor argued Mr. Aylor and Mr. Vanderpool "heard the gurgling of Colleen Hufford, and then it stopped." Tr. 2469. The prosecutor then argued regarding Mr. Nolen's alleged attempts to stab Mr. Aylor, "You can just think of the terror and the fear that was happening in that instance to Bryan Aylor." Tr. 2469.

In the capital sentencing stage, the prosecutor argued, "Think about the last few minutes of Colleen's Hufford life, because that's why we're here. What is her death worth?" Tr. 3742. The improper and prejudicial arguments continued when the prosecutor told the jury to look at the gruesome photographs again:

> [Y]ou do have to remember how she [Ms. Hufford] fought. And look at these pictures of her hands and her fingers and these are clean-cut pictures, as that knife was plunging into her, and the most egregious one, on her wrist.
> This is why we're here, because she fought with every ounce of her being as he stabbed her and stabbed her and stabbed her and stabbed her and then as he's pulling her. . . . [T]hat right here is where she hung on to that doorway for dear life.

Tr. 3744.

OCCA unreasonably found that "[w]hile it is improper for the prosecutor to elicit sympathy for the victim from the jurors, they are permitted to discuss the evidence from their respective standpoints. . . . The comments at issue here were based on the evidence and not merely appeals for sympathy." Att. 1 at 18 (internal citations omitted). OCCA's finding was factually unreasonable. The only purpose of these arguments – including "[y]ou can just think of the terror and the fear that was happening in that instance" and "[t]hink about the last few minutes of Colleen Hufford's life, because that's why we're here. What is her death worth?" – was to elicit sympathy. Tr. 2469; Tr. 3742. OCCA's finding of no error was also contrary to or an unreasonable application of clearly established federal law, including *Darden*, *Donnelly*, and *Caldwell*. *Le*, 311 F.3d at 1015.

### 5. The Prosecutors Improperly Equated a Death Penalty Verdict with "Justice" and Argued It Was the "Right Thing."

The prosecutors' argument that a death sentence was "justice" and the "right thing" improperly expressed personal opinions. Tr. 3775-76. In the State's first capital-sentencing-stage closing argument, the prosecutor said, "I submit to you that death is the only appropriate punishment for who [Mr. Nolen] is and what he did. Death is what he has earned. And death is what he deserves." Tr. 3746. In the State's second capital-sentencing-stage closing argument, the other prosecutor argued:

> I submit to you, that based on the law and the evidence, that this one right here, the one that fixes his punishment at death, is the one that your foreperson should sign, because that's the punishment that he deserves, that he earned, that's what this crime calls for and nothing less would be justice. The death penalty is the right thing in this case. It is the just thing in this case I submit to you. . . . [T]he right thing is not always easy but it is always right. I'm asking you to sentence this man to death and . . . show him with your verdict that this is what happens when you carry out a crime this evil.

Tr. 3775-76.

OCCA found, "[W]hile the prosecutor should not express his personal opinion regarding justice, the comments at issue here were not expressed as the prosecutor's personal opinion regarding justice and the appropriateness of the death penalty, but were based upon the law and the evidence." Att. 1 at 18.

This finding was factually unreasonable. Arguments including: "*I submit* . . . the one that fixes his punishment at death, is the one your foreperson should sign, because that's the punishment that he deserves . . . and nothing less would be justice," "The death penalty . . . is the just thing in this case *I submit to you*," and "*I'm asking* you to sentence this man to death," Tr. 3775-76 (emphasis added), were expressed as personal opinion.

OCCA's finding of no error was also contrary to or an unreasonable application of clearly established federal law. In *United States v. Young*, 470 U.S. 1 (1985) (citation omitted), the Supreme Court found, "The prosecutor was . . . in error to try to exhort the jury to 'do its job'; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice." *Id.* at 18. "'[I]t is error for a prosecutor to exhort a jury' to reach a guilty verdict based 'on the grounds of civic duty[.]'" *Spears v. Mullin*, 343 F.3d 1215, 1247 (10th Cir. 2003) (quoting *Viereck v. United States*, 318 U.S. 236, 247-48 (1943)). "Prosecutors are not permitted to incite the passions of the jury by suggesting they can act as the 'community conscience' to society's problems." *United States v. Rogers*, 556 F.3d 1130, 1143 (10th Cir. 2009) (quoting *United States v. Solivan*, 937 F.2d 1146, 1151, 1153 (6th Cir. 1991)). Further, "[i]t is improper for a prosecutor to inject his personal opinion on the propriety of the death sentence." *Thornburg v. Mullin*, 422 F.3d 1113, 1135 (10th Cir. 2005).

## B. Appellate Counsel Was Ineffective for Failing to Raise a Claim of Trial Counsel Ineffectiveness.

OCCA did not adjudicate the merits of Mr. Nolen's claim of appellate counsel's ineffectiveness for failure to raise a claim of trial counsel's ineffectiveness for failure to object to prosecutorial misconduct. Thus, this Court should review the claim de novo.

Appellate counsel were ineffective in failing to raise a claim of trial counsel's ineffectiveness in failing to object to prosecutorial misconduct. *See Evitts v. Lucey*, 469 U.S. 387, 397-98 (1985). Appellate counsel had no reasonable basis for failing to raise this claim, and their failure constituted deficient performance. *See Strickland*, 466 U.S. at 687,

689; *Cargle*, 317 F.3d at 1205. Appellate counsel's failure prejudiced Mr. Nolen, as the underlying claim of trial counsel's ineffectiveness had a reasonable probability of success. *See Strickland*, 466 U.S. at 687; *Neill*, 278 F.3d at 1057 n.5.[42]

Trial counsel's failure to object to several instances of misconduct – that the prosecutor misstated facts in evidence, appealed to the jury's sympathy and emotions, and equated a death penalty verdict with "justice" and argued it was the "right thing" – constituted deficient performance and prejudiced Mr. Nolen. *See Strickland*, 466 U.S. at 687. Counsel had no reasonable basis for failing to object to these improper and prejudicial arguments. *See id.* at 689. Had defense counsel objected to this misconduct, there is a reasonable likelihood Mr. Nolen would have been acquitted or received lesser sentences. *See id.* at 689.

## IX.  MR. NOLEN IS ENTITLED TO RELIEF FROM HIS SENTENCE BECAUSE OF THE CUMULATIVE PREJUDICE OF THE CONSTITUTIONAL ERRORS DESCRIBED HEREIN.[43]

If none of the previously discussed errors alone necessitates relief, their combined effect certainly does. *Cargile v. Mullin*, 317 F.3d 1196, 1200 (10th Cir. 2003). The United States Supreme Court has long recognized that cumulative error can give rise to a constitutional violation. *See Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978) (cumulative effect of potentially damaging instructions and prosecution argument violated

---

[42] In assessing prejudice, the Court should consider the cumulative impact of the misconduct had appellate counsel raised all of the instances on appeal. *See* Claim VII.

[43] Mr. Nolen raised this claim on page 81 of his direct appeal brief, and pages 49-50 of his application for post-conviction relief.

due process guarantee of fundamental fairness); *Donnelly*, 416 U.S. at 639-42 (considering totality of prosecutorial misconduct in context of entire trial to decide if misconduct was sufficiently prejudicial to violate defendant's due process rights). "Cumulative-error analysis merely aggregates all the errors . . . found to be harmless, . . . and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Hamilton v. Mullin*, 436 F.3d 1181, 1196 (10th Cir. 2006) (internal citation omitted).

The cumulative effect of the guilt- and penalty-stage errors resulted in an invalid death sentence for Mr. Nolen. *See Darks v. Mullin*, 327 F.3d 1001, 1018 (2003) (when assessing cumulative error, only first-stage errors are relevant to conviction, but all errors are relevant to sentence). If this Court finds none of the errors here set forth, when considered individually, necessitate habeas relief, the Court should find the cumulative effect of all the errors deprived Mr. Nolen of his constitutional right to a fair trial and reliable sentence.

## PRAYER FOR RELIEF

Petitioner respectfully requests that this Court (1) vacate his conviction and grant a new guilt-innocence phase; (2) vacate his sentence of death and order that a life sentence be imposed pursuant to *Atkins*, or (3) in the alternative, that his death sentence be vacated and a new penalty phase be held; and (4) conduct an evidentiary hearing on any claims involving disputed issues of fact and allow discovery as may be appropriate.

Respectfully submitted,

/s/ Hunter S. Labovitz
Hunter S. Labovitz
Katherine Ensler
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: (215) 928-0520
hunter_labovitz@fd.org
katherine_ensler@fd.org

*Counsel for Petitioner Alton Nolen*

**CERTIFICATE OF SERVICE**

I, Hunter Labovitz, hereby certify that on this 27th day of January, 2023, I electronically transmitted the foregoing document to the Clerk of Court using the Court's electronic case filing system. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Jennifer L. Crabb, Assistant Attorney General, Attorney for Respondents

Caroline E.J. Hunt, Assistant Attorney General, Attorney for Respondents

/s/ Hunter Labovitz
Hunter Labovitz